**AMERICAN COLLEGE OF OBSTETRICIANS AND GYNECOLOGISTS, PENNSYLVANIA SECTION; Henry H. Fetterman, M.D., Thomas Allen, M.D., and Francis L. Hutchins, Jr., M.D. on behalf of themselves and all others similarly situated; Allen J. Kline, D.O., on behalf of himself and all others similarly situated; Brooks R. Susman; Paul Washington; Morgan P. Plant, on behalf of herself and all others similarly situated; Elizabeth Blackwell Health Center For Women; Planned Parenthood of Southeastern Pennsylvania; Reproductive Health and Counseling Center; and Women's Health Services, Inc., Appellants in No. 82–1785 and Cross-Appellees in No. 82–1846**

v.

**Richard THORNBURGH, H. Arnold Muller, Hellen B. O'Bannon, Michael J. Browne, William R. Davis, Leroy S. Zimmerman, personally and in their official capacities, and Joseph A. Smyth, Jr., personally and in his official capacity, together with all others similarly situated, Appellees in No. 82–1785 and Cross-Appellants in No. 82–1846.**

Nos. 82–1785, 82–1846.

United States Court of Appeals, Third Circuit.

Argued March 11, 1983.

Reargued Nov. 21, 1983.

Decided May 31, 1984.

Rehearing and Rehearing In Banc Denied June 28, 1984.

Seitz, Chief Judge, dissented in part, concurred in part, and filed an opinion.

Aldisert, Chief Judge, and Gibbons, Circuit Judge, dissented from denial of petition for rehearing.

Adams, Circuit Judge, filed statement sur denial of petition for rehearing.

Weis, Circuit Judge, filed statement sur petition for rehearing.

Kathryn Kolbert (argued), Women's Law Project, John G. Harkins, Jr., Laurence Z. Shiekman, Thomas E. Zemaitis (argued), Brenda Y. Moss, Nancy H. Fullam, Pepper, Hamilton & Scheetz, Philadelphia, Pa., Le-Roy S. Zimmerman, Atty. Gen., Andrew S. Gordon, Deputy Atty. Gen. (argued), Daniel R. Schuckers, Asst. Atty. Gen., Allen C. Warshaw, Deputy Atty. Gen., Harrisburg, Pa., Ronald T. Williamson, Asst. Dist. Atty., Norristown, Pa., for appellees.

Seth Kreimer, American Civil Liberties Union, University of Pennsylvania Law School, Philadelphia, Pa., Marsha Levick, NOW Legal Defense and Educ. Fund, New York City, for appellants.

John E. McKeever, Edward R. Grant, Gerry J. Woods, Joseph Cascarelli, Iovine & Woods, Philadelphia, Pa., for amici curiae, John D. Lane, M.D., et al.

Lori K. Serratelli, Serratelli & Schiffman, Andrea C. Jacobsen, Rains & Jacobsen, Harrisburg, Pa., for amici curiae, Pennsylvania NOW, The Greater Pittsburgh YWCA and The Philadelphia Reproductive Rights Organization.

Before SEITZ, Chief Judge, and HIGGINBOTHAM and SLOVITER, Circuit Judges.

## OPINION OF THE COURT

SLOVITER, Circuit Judge.

The Supreme Court has firmly established that the fundamental constitutional protection of privacy encompasses a woman's right to obtain an abortion. At issue before us is the appellants' contention that Pennsylvania's 1982 Abortion Control Act, 18 Pa.Cons.Stat.Ann. §§ 3201–3220 (Purdon 1983), impermissibly circumscribes that right. We examine that contention by considering the legislative background of the 1982 Act, the procedural posture of this case, the applicable Supreme Court decisions, and a section-by-section analysis of the Pennsylvania Act. We conclude that most of the provisions attacked by appellants are unconstitutional as a matter of law.

### I.

### LEGISLATIVE BACKGROUND OF THE 1982 ABORTION CONTROL ACT

Until Pennsylvania enacted its first comprehensive statute dealing with abortion, the relevant law provided that any person who took steps aimed at "unlawfully" causing a woman's miscarriage committed a felony punishable by fine and imprisonment. *See* Penal Code of 1939, No. 375, § 718, 1939 Pa.Laws 872, 958, *saved from repeal,* Crimes Code of 1972, No. 334, § 5, 1972 Pa.Laws 1482, 1611 (repealed 1974).[1]

1. A version identical except as to penalty was contained in the Penal Code of 1860, No. 374, § 88, 1860 Pa.Laws 382, 404–05. In 1850, the Pennsylvania Supreme Court held that the attempt to cause miscarriage was a crime at common law. *See, e.g., Mills v. Commonwealth,* 13

Because the statute did not define "unlawfully" and did not specify whether therapeutic abortions were excepted, it was unclear whether a physician in Pennsylvania could legally terminate a pregnancy that involved substantial risk to the physical or mental health of the mother, although other jurisdictions permitted such abortions. *See* Trout, *Therapeutic Abortion Laws Need Therapy*, 37 Temp.L.Q. 172, 184–86 (1964); Note, *The Antiquated Abortion Laws*, 34 Temp.L.Q. 146, 150–51 (1961).

The landmark decision in *Roe v. Wade*, 410 U.S. 113, 93 S.Ct. 705, 35 L.Ed.2d 147 (1973), invalidated statutes such as Pennsylvania's because a general prohibition of abortions violated a woman's fundamental constitutional right to privacy. *See also Doe v. Bolton*, 410 U.S. 179, 93 S.Ct. 739, 35 L.Ed.2d 201 (1973). The following year, Pennsylvania enacted the state's first comprehensive "Abortion Control Act" over the governor's veto. Abortion Control Act of 1974, No. 209, 1974 Pa.Laws 639 (amended 1978, repealed 1982). Many of the provisions of that Act, such as those requiring spousal or parental consent to an abortion, banning advertising of abortion procedures, and enacting a vague criminal standard governing abortions at "viability," were held unconstitutional. *See Planned Parenthood Association v. Fitzpatrick*, 401 F.Supp. 554 (E.D.Pa.1975) (three-judge court), *aff'd mem. in part sub nom. Franklin v. Fitzpatrick and vacated and remanded mem. in part sub nom. Beal v. Franklin*, 428 U.S. 901, 96 S.Ct. 3202, 49 L.Ed.2d 1205 (1976), *modified on remand*, No. 74–2440 (E.D.Pa. Sept. 16, 1977) (unreported), *aff'd sub nom. Colautti v. Frank-*

lin, 439 U.S. 379, 384–86, 99 S.Ct. 675, 679–80, 58 L.Ed.2d 596 (1979) (explaining case history). *See also Doe v. Zimmerman*, 405 F.Supp. 534 (M.D.Pa.1975) (three-judge court).

Thereafter, members of the Pennsylvania legislature made a renewed effort to enact a comprehensive scheme that contained stringent limitations on abortions.[2] That bill was rejected by the relevant legislative committee; however, when presented on the floor of the House as an amendment to an unrelated Senate bill,[3] it passed overwhelmingly. Representative Stephen Freind, leader of floor debate and co-sponsor of the bill, reportedly explained its import at a news conference as follows:

> Look, we can't stop abortions. The message we're sending to doctors is this: "We can't stop you from performing abortions. We wish we could, and we hope to God that someday we'll get the Human Life Amendment so we can. But until that time there are going to be regulations you'll have to follow if you're going to perform abortions."

Ecenbarger, *The Life and Death of Senate Bill 742*, Philadelphia Inquirer, Jan. 31, 1982, Today Magazine at 23.

The Senate, after scant debate, concurred in the House amendment. Pennsylvania's Governor, Dick Thornburgh, vetoed the bill stating,

> I am concerned that [some] provisions, and to some extent the entire tone and tenor of the bill, would have the effect of imposing an undue, and, in some cases, unconstitutional burden upon even in-

---

Pa. 631, 633 (1850) ("It is a flagrant crime at common law to attempt to procure the miscarriage or abortion of the woman .... It is a crime against nature which obstructs the fountain of life, and therefore it is punished").

Other provisions of the Penal Code imposed a more severe penalty for abortions that caused a woman's death, Penal Code of 1939, § 719, and made it a crime for a woman to conceal the death of a bastard child. *Id.*, § 720.

**2.** The bill was based on a model developed by Americans United For Life, a Chicago-based

nonprofit organization. *See* Note, *Toward Constitutional Abortion Control Legislation: The Pennsylvania Approach*, 87 Dick.L.Rev. 373, 382 n. 84 (1983); Ecenbarger, *The Life and Death of Senate Bill 742*, Philadelphia Inquirer, Jan. 31, 1982, Today Magazine at 16.

**3.** The Senate bill to which the abortion amendment was attached and deemed "germane" by the House concerned "tough guy" competitions (bouts involving physical contact between individuals without professional experience).

formed mature adults intent on obtaining an abortion under circumstances in which the U.S. Supreme Court has determined they are entitled to do so.

Veto Message to the Senate (Dec. 23, 1981), History of Senate Bills V–2, V–4 (1981–82).[4] The abortion control bill was then revised to some extent and, after being introduced on the floor of the House as an amendment to a bill regulating paramilitary training, passed both the House and Senate. It was signed by the Governor on June 11, 1982, to become effective December 8, 1982.

In brief, the 1982 Abortion Control Act imposes detailed regulation of abortions, requiring that a physician give specified information for informed consent; that a pregnant woman wait 24 hours to give her consent; that unemancipated minors obtain parental or judicial consent; and that all second trimester abortions be performed in hospitals. The Act also strictly limits abortions after a fetus may be "viable"; requires use of techniques and, in some instances, the presence of a second physician, to save the aborted fetus; imposes detailed reporting rules; requires pathology reports; restricts the use of public resources for abortions;[5] and regulates private insurance coverage. Physicians and clinics violating the Act's provisions are subject to criminal prosecution for felonies and misdemeanors, as well as to revocation or suspension of licenses and to civil tort liability.

## II.

## PROCEDURAL HISTORY

Before the Act took effect, plaintiffs, the American College of Obstetricians and Gynecologists, Pennsylvania Section (ACOG), individual physicians who perform abortions, abortion clinics, clergy, and one woman who has health insurance including comprehensive coverage for abortion, filed suit in the United States District Court for the Eastern District of Pennsylvania alleging that the Act was unconstitutional in its entirety. They filed a motion for preliminary injunction, accompanied by 41 affidavits from physicians, minors, counselors, experts, clinic directors and religious leaders and a comprehensive memorandum of law. Defendants, the governor and six other state and local officials (referred to collectively as Pennsylvania), submitted an equally comprehensive opposing memorandum. The parties submitted the issues to the district court on a detailed stipulation of uncontested facts ("Stipulation") in lieu of testimony.

The district court issued an order on December 7, 1982 enjoining the mandatory 24-hour waiting period of section 3205. The court concluded, however, that plaintiffs had failed to establish a likelihood of success as to the remaining provisions and as to the Act in its entirety. *American College of Obstetricians and Gynecologists v. Thornburgh,* 552 F.Supp. 791 (E.D.

---

**4.** In his veto message, Governor Thornburgh also stated,

What this bill would do is erect a series of hurdles which would have to be cleared by a pregnant woman interested in obtaining an abortion .... I am concerned that some of the detailed, complex and burdensome requirements of the bill, accompanied as they are by severe criminal penalties, could well foster an atmosphere in which many physicians would be deterred from providing the kind of abortion-related medical services to which the U.S. Supreme Court has held their patients are constitutionally entitled. This could well disrupt the traditional doctor-patient relationship and impinge upon the right of physicians to practice. Of even greater concern is the potential for more experienced and conscientious physicians to refrain from involvement in even medically necessary

abortions, and to abandon the field to marginal practitioners. It could even lead to a resurgence of "back alley" abortions, which no thoughtful person would wish to happen. Veto Message at V–4.

**5.** The Commonwealth Court of Pennsylvania has recently held that restrictions on state funding of abortions, contained in 18 Pa.Cons.Stat. Ann. § 3215(c), violate the equal protection and privacy provisions of the state constitution as well as the federal constitutional right to privacy. *Fischer v. Department of Public Welfare,* No. 283 C.D.1981 (Pa.Cmmw. March 9, 1984). *See also Fischer v. Department of Public Welfare,* 497 Pa. 267, 439 A.2d 1172 (1982) (affirming preliminary injunction against predecessor provision). This issue has not been raised before us.

Pa.1982).[6] In its opinion, the district court relied in significant part on two decisions from other circuits which were then pending before the Supreme Court, *Akron Center for Reproductive Health v. City of Akron*, 651 F.2d 1198 (6th Cir.1981), *aff'd in part and rev'd in part*, 462 U.S. 416, 103 S.Ct. 2481, 76 L.Ed.2d 687 (1983) (*Akron*), and *Planned Parenthood Association v. Ashcroft*, 655 F.2d 848 (8th Cir. 1981), *aff'd in part and rev'd in part*, 462 U.S. 476, 103 S.Ct. 2517, 76 L.Ed.2d 733 (1983) (*Ashcroft*).

Plaintiffs immediately filed a notice of appeal, and the Commonwealth cross-appealed as to the 24-hour waiting period. On December 9, 1982, this court granted plaintiffs' request for a stay of enforcement of the Act pending appeal. After expedited briefing and oral argument, we ordered the matter held pending the Supreme Court's decision in *Akron, Ashcroft*, and a third case involving criminal sanctions for abortions, *Simopoulos v. Virginia*, 462 U.S. 506, 103 S.Ct. 2532, 76 L.Ed.2d 755 (1983). Following those decisions, we

directed the parties to file supplemental briefs and heard reargument on the impact of those cases on the issues before us. Thus, although this appeal arises from a ruling on a request for a preliminary injunction, we have before us an unusually complete factual and legal presentation from which to address the important constitutional issues at stake. The customary discretion accorded to a district court's ruling on a preliminary injunction yields to our plenary scope of review as to the applicable law. *Apple Computer, Inc. v. Franklin Corp.*, 714 F.2d 1240, 1242 (3d Cir.1983).

## III.

### LEGAL PRINCIPLES GOVERNING ABORTIONS

The legal principles which guide our consideration of the Pennsylvania statute have evolved from the Supreme Court decisions in which the Court considered various state statutes or local ordinances regulating and/or prohibiting abortions.[7] The pole-

---

**6.** The district court concluded that plaintiff physicians, ACOG, and medical providers all had standing to raise their own interests (or the interests of members) and those of patients and customers in challenging the Act's constitutionality. We affirm this general conclusion. *See, e.g., City of Akron v. Akron Center for Reproductive Health*, 462 U.S. 416, 103 S.Ct. 2481, 76 L.Ed.2d 687 (1983) (challenge by abortion clinics and a physician); *Planned Parenthood Association v. Ashcroft*, 462 U.S. 476, 103 S.Ct. 2517, 76 L.Ed.2d 733 (1983) (challenge by Planned Parenthood, two physicians and an abortion clinic); *Planned Parenthood v. Danforth*, 428 U.S. 52, 62, 96 S.Ct. 2831, 2837, 49 L.Ed.2d 788 (1976) (challenge by Planned Parenthood and two physicians); *Singleton v. Wulff*, 428 U.S. 106, 112–18, 96 S.Ct. 2868, 2873–76, 49 L.Ed.2d 826 (1976) (challenge by two physicians). We address *infra* at note 21 the specific question of standing with respect to the Act's insurance provisions. The clergymen were held by the district court to lack standing, 552 F.Supp. at 795, but do not appeal this conclusion. Defendant Thornburgh has been dismissed by stipulation of the parties. A motion by defendant O'Bannon for dismissal is pending.

**7.** *City of Akron v. Akron Center for Reproductive Health*, 462 U.S. 416, 103 S.Ct. 2481, 76 L.Ed.2d 687 (1983); *Planned Parenthood Association v. Ashcroft*, 462 U.S. 476, 103 S.Ct. 2517, 76

L.Ed.2d 733 (1983); *Simopoulos v. Virginia*, 462 U.S. 506, 103 S.Ct. 2532, 76 L.Ed.2d 755 (1983); *H.L. v. Matheson*, 450 U.S. 398, 101 S.Ct. 1164, 67 L.Ed.2d 388 (1981); *Bellotti v. Baird (Bellotti II)*, 443 U.S. 622, 99 S.Ct. 3035, 61 L.Ed.2d 797 (1979); *Colautti v. Franklin*, 439 U.S. 379, 99 S.Ct. 675, 58 L.Ed.2d 596 (1979); *Beal v. Doe*, 432 U.S. 438, 97 S.Ct. 2366, 53 L.Ed.2d 464 (1977); *Maher v. Roe*, 432 U.S. 464, 97 S.Ct. 2376, 53 L.Ed.2d 484 (1977); *Poelker v. Doe*, 432 U.S. 519, 97 S.Ct. 2391, 53 L.Ed.2d 528 (1977) (per curiam); *Planned Parenthood v. Danforth*, 428 U.S. 52, 96 S.Ct. 2831, 49 L.Ed.2d 788 (1976); *Singleton v. Wulff*, 428 U.S. 106, 96 S.Ct. 2868, 49 L.Ed.2d 826 (1976); *Bellotti v. Baird (Bellotti I)*, 428 U.S. 132, 96 S.Ct. 2857, 49 L.Ed.2d 844 (1976); *Connecticut v. Menillo*, 423 U.S. 9, 96 S.Ct. 170, 46 L.Ed.2d 152 (1975) (per curiam); *Bigelow v. Virginia*, 421 U.S. 809, 95 S.Ct. 2222, 44 L.Ed.2d 600 (1975); *Roe v. Wade*, 410 U.S. 113, 93 S.Ct. 705, 35 L.Ed.2d 147 (1973); *Doe v. Bolton*, 410 U.S. 179, 93 S.Ct. 739, 35 L.Ed.2d 201 (1973); *United States v. Vuitch*, 402 U.S. 62, 91 S.Ct. 1294, 28 L.Ed.2d 601 (1971); *see also Harris v. McRae*, 448 U.S. 297, 100 S.Ct. 2671, 65 L.Ed.2d 784 (1980); *Williams v. Zbaraz*, 448 U.S. 358, 100 S.Ct. 2694, 65 L.Ed.2d 831 (1980); *cf. Carey v. Population Services International*, 431 U.S. 678, 97 S.Ct. 2010, 52 L.Ed.2d 675 (1977) (restrictions on sale and advertising of contraceptives).

star remains the seminal opinion of Justice Blackmun writing for the majority in *Roe v. Wade*, 410 U.S. 113, 93 S.Ct. 705, 35 L.Ed.2d 147 (1973). There the Court held that the fundamental constitutional right of privacy, which guarantees freedom of personal choice in matters of marriage and family life, *see, e.g., Eisenstadt v. Baird*, 405 U.S. 438, 92 S.Ct. 1029, 31 L.Ed.2d 349 (1972); *Loving v. Virginia*, 388 U.S. 1, 87 S.Ct. 1817, 18 L.Ed.2d 1010 (1967); *Griswold v. Connecticut*, 381 U.S. 479, 85 S.Ct. 1678, 14 L.Ed.2d 510 (1965), also encompasses a woman's right to choose an abortion. 410 U.S. at 153, 93 S.Ct. at 726. In the decade of decisions following *Roe v. Wade*, "the Court repeatedly and consistently has accepted and applied the basic principle that a woman has a fundamental right to make the highly personal choice whether or not to terminate her pregnancy." *City of Akron v. Akron Center for Reproductive Health*, 103 S.Ct. 2481, 2487 n. 1 (1983) (*Akron*).

■ Because abortion is a medical procedure requiring the advice and assistance of competent, trained medical personnel, a woman cannot exercise her fundamental right alone. For this reason, the states must give the physician room to exercise sound medical judgment in assisting the woman to make and implement her decision. *See Akron*, 103 S.Ct. at 2491; *Colautti v. Franklin*, 439 U.S. 379, 387, 99 S.Ct. 675, 681, 58 L.Ed.2d 596 (1979); *Doe v. Bolton*, 410 U.S. 179, 192, 93 S.Ct. 739, 747, 35 L.Ed.2d 201 (1973).

Even after the affirmation of these principles in *Roe v. Wade* and their reaffirmation in the cases that followed, some states have continued to enact laws limiting the pregnant woman's constitutional right by placing burdensome restrictions on her physician, and by imposing other obstacles that prevent, delay, or discourage the woman's attempt to vindicate her right of personal choice. The role of the courts in reviewing such legislation has been clearly delineated: "[R]estrictive state regulation of the right to choose abortion, as with other fundamental rights subject to searching judicial examination, must be supported by a compelling state interest." *Akron*, 103 S.Ct. at 2491; *Roe v. Wade*, 410 U.S. at 155, 93 S.Ct. at 728.

The Supreme Court has identified two compelling state interests that may justify regulation or control of the woman's exercise of her right: the health of the pregnant woman and the protection of the fetus capable of meaningful life.[8] The Court has viewed the strength of the relevant interests in terms of the trimesters of pregnancy.

■■ The state's interest in the mother's health becomes compelling at the end of the first trimester. *Roe v. Wade*, 410 U.S. at 163, 93 S.Ct. at 731. Because of the relative simplicity and safety of abortion procedures during the first trimester, regulations imposed during that period and that restrict competent medical personnel do not appreciably advance the State's interest in maternal health. *Akron*, 103 S.Ct. at 2492 & n. 11, 2495 (explicitly retaining the trimester standard). The absence of a compelling state interest during the first trimester requires that the state permit the woman, "in consultation with her physician, to decide to have an abortion and to effectuate that decision 'free of interference by the state.'" *Akron*, 103 S.Ct. at 2492 (quoting *Roe v. Wade*, 410 U.S. at 163, 93 S.Ct. at 732).[9]

8. The Court has also recognized that states have a legitimate interest in protecting the best interests of minors who seek abortions and who may be less capable than adults of making important decisions. *See Ashcroft*, 103 S.Ct. at 2525 (parental or judicial consent); *H.L. v. Matheson*, 450 U.S. 398, 101 S.Ct. 1164, 67 L.Ed.2d 388 (1981) (parental notice).

9. However, certain regulations touching on first trimester abortions that have no significant impact on the woman's exercise of her right may be permissible if the State can prove they further important state health objectives without interfering in the physician-patient relationship or the woman's choice between abortion and childbirth. *See Ashcroft*, 103 S.Ct. at 2522–25 (pathology reports); *Planned Parenthood v. Danforth*, 428 U.S. at 65–67, 79–81, 96 S.Ct. at 2839–40, 2845–46 (minor informed-consent and recordkeeping requirements).

■ From the end of the first trimester, the state may "regulate the abortion procedure to the extent that the regulation reasonably relates to the preservation and protection of maternal health." *Roe v. Wade*, 410 U.S. at 163, 93 S.Ct. at 732. These regulations may not depart from accepted medical practice. *Akron*, 103 S.Ct. at 2493. Moreover, the restrictions adopted as health standards must be legitimately and directly related to the health objective and must not be overbroad or unreasonably burdensome upon a woman's access to an abortion,[10] since during this period the state may not seek to "directly restrict[ ] a woman's decision whether or not to terminate her pregnancy." *Colautti v. Franklin*, 439 U.S. at 386, 99 S.Ct. at 681.

■ The interest of the state in the potentiality of human life becomes compelling only at "viability," when the attending physician, "on the particular facts of the case before him," concludes there is a reasonable likelihood of the fetus' "sustained survival" and "meaningful life" outside the womb. *Colautti v. Franklin*, 439 U.S. at 387–88, 99 S.Ct. at 681–82; *see Roe v. Wade*, 410 U.S. at 163, 93 S.Ct. at 732. In *Roe*, the Court observed that most physicians placed viability at about seven months, though some considered it possible as early as six months, the end of the second trimester. 410 U.S. at 160, 93 S.Ct. at 730.

■ States may regulate abortions after viability in the interest of the unborn child and may even prohibit abortions, except those to preserve the life or health of the mother. *Id.* at 164–65, 93 S.Ct. at 732. "Serious ethical and constitutional difficulties" are presented, however, if such measures do not clearly prevent the doctor from "trad[ing] off" the health of the woman for

that of the fetus. *Colautti v. Franklin*, 439 U.S. at 400, 99 S.Ct. at 688. *See also Ashcroft*, 103 S.Ct. at 2522 n. 8 (plurality); *id.* at 2530–31 (dissent). The Court has carefully examined statutes that impose duties or criminal sanctions on the physician at "viability" because of the significant dangers such laws pose as to vagueness, overbreadth, interference with the doctor-patient relationship, and chilling of the woman's constitutional rights. *See, e.g., Planned Parenthood v. Danforth*, 428 U.S. at 82–84, 96 S.Ct. at 2847–48 (overbreadth); *Colautti v. Franklin*, 439 U.S. at 389–400, 99 S.Ct. at 682–88 (vagueness, chilling, overbreadth).

With these principles in mind we turn to the Pennsylvania Act. We may not inquire as to whether the Pennsylvania legislature's intent to restrict a pregnant woman's fundamental right to choose an abortion was so "fundamental an inducement" as to invalidate the entire act, *see* 2 C. Sands, Sutherland Statutory Construction § 44.06 (4th ed. 1973), or whether the provisions that the Commonwealth now concedes are unconstitutional and those that we conclude impermissibly infringe on the woman's rights, *see infra*, are so central to the Act's dominant purpose as to warrant voiding the entire statute. *See* 2 C. Sands at § 44.07. Instead of invalidating the entire act, as appellants urge, we are obliged to follow the example of the Supreme Court in overlooking what may reasonably be deemed to be a pervasive invalid intent, and instead review the various provisions of the Pennsylvania statute independently, and on their own merit. *See, e.g., Ashcroft*, 103 S.Ct. at 2521–26; *Planned Parenthood v. Danforth*, 428 U.S. at 63–67, 79–81, 96 S.Ct. at 2838–40, 2845–46 (both upholding portions of Missouri's comprehensive abortion legislation). The relevant

---

10. On these grounds, the Supreme Court has struck down a state ban on saline abortions in the second-trimester, finding that this would increase costs and limit availability of abortions without a showing of important health benefits. *Planned Parenthood v. Danforth*, 428 U.S. at 77–79, 96 S.Ct. at 2844–45. Similarly, the Court has rejected a requirement that second-trimester

abortions be performed only in hospitals, concluding that the increased difficulty, cost, and risk of delay in finding and obtaining a hospital abortion was significant and that medical knowledge did not support hospitalization for *all* second-trimester abortions. *Akron*, 103 S.Ct. at 2495–97; *Ashcroft*, 103 S.Ct. at 2520.

provisions of the Pennsylvania 1982 Abortion Control Act are set forth in Appendix A to this opinion.

## IV.

### PROVISIONS CONCEDED TO BE UNCONSTITUTIONAL

■ The Commonwealth properly concedes that in light of *Akron* and *Ashcroft*, several sections of the Act are unconstitutional on their face. The only provisions enjoined by the district court are found in §§ 3205(a)(1) and (a)(2), and impose a 24-hour waiting period between the time a woman seeking an abortion receives the required medical advice and the time a physician may accept her certification of informed consent and perform the abortion. The Supreme Court in *Akron* found that no interest in maternal health was furthered by such an "arbitrary and inflexible waiting period" and that such a mandatory 24-hour waiting period impermissibly infringed upon the physician's discretion in the exercise of medical judgment, while increasing the cost and risk in delay of abortions by requiring two trips to an abortion facility. 103 S.Ct. at 2503. "[I]f a woman, after appropriate counseling, is prepared to give her written informed consent and proceed with the abortion, a State may not demand that she delay the effectuation of that decision." *Id.*

■ Second, the Commonwealth concedes that the district court erred in upholding the requirement in section 3205(a)(1) that the physician performing the abortion or the referring physician, "but not ... the agent or representative of either," counsel the woman on the risks of the abortion procedure. The Supreme Court found in *Akron* that it was "unreasonable for a State to insist that only a physician is competent to provide the information and counseling relevent to informed consent," 103 S.Ct. at 2503, because the State's interest is in ensuring that the woman "obtains the necessary information and counseling from a qualified person, not

[in] the identity of the person from whom she obtains it." *Id.* at 2502.

■ Third, the Commonwealth concedes the unconstitutionality of section 3209, which requires that all non-emergency abortions after the first trimester be performed in a hospital. The Supreme Court concluded that such a provision "places a significant obstacle in the path of women seeking an abortion." *Akron,* 103 S.Ct. at 2495. Not only do costs greatly increase, but given the difficulty of finding a willing hospital the requirement "may force women to travel to find available facilities, resulting in both financial expense and additional health risk." *Id.* This significant burden is not justifiable as a health regulation because many second-trimester abortions can be performed safely on an outpatient basis. Thus, the requirement "has the effect of inhibiting ... the vast majority of abortions after the first 12 weeks and therefore unreasonably infringes upon a woman's constitutional right to obtain an abortion." *Id.* at 2497 (quoting *Planned Parenthood v. Danforth,* 428 U.S. at 79, 96 S.Ct. at 2845) (citation omitted). These rulings by the Supreme Court are dispositive of the similar provisions in the Pennsylvania Act.

## V.

### CHALLENGED PROVISIONS

§ 3203: *Definitions*

*Abortion*

■ The Act defines abortion as the use of any means to terminate a "clinically diagnosable" pregnancy "with knowledge that the termination by those means will, with reasonable likelihood, cause the death of the unborn child." It expressly excludes from the definition "the use of an intrauterine device or birth control pill to inhibit or prevent ovulation, fertilization or the implantation of a fertilized ovum within the uterus." Appellants challenge this definition as vague and overbroad. They argue that it may be read to include ordinary gynecological procedures on women not

known or believed to be pregnant which cause an abortion when the woman's pregnancy was, in fact, diagnosable, and that this invalidity infects and is inseparable from the remainder of the Act. The Commonwealth concedes that the statute will survive only if "abortion" is defined to include an intent requirement. Brief for Appellees at 37–39.

If the Act explicitly defined abortion as the intentional termination of a human pregnancy, it would satisfy the requirement that a statute "give a person of ordinary intelligence fair notice that his contemplated conduct is forbidden by the statute," *United States v. Harriss,* 347 U.S. 612, 617, 74 S.Ct. 808, 811, 98 L.Ed. 989 (1954), or give "a reasonable opportunity to know what is prohibited," *Grayned v. City of Rockford,* 408 U.S. 104, 108, 92 S.Ct. 2294, 2298, 33 L.Ed.2d 222 (1972). We have the duty in "marginal cases" to make the offense "constitutionally definite by a reasonable construction of the statute," *United States v. Harriss,* 347 U.S. at 618, 74 S.Ct. at 812, and thus read the definition to incorporate an intent requirement as defined in the Pennsylvania Code, 18 Pa. Cons.Stat.Ann. § 302(b)(1) (Purdon 1983), thereby saving it from unconstitutionality.

*Physician*

■ "Physician" is defined as "[a]ny person licensed to practice medicine in this Commonwealth." Appellants argue that the Act excludes osteopaths and that this exclusion violates the Equal Protection clause of the Fourteenth Amendment. The Commonwealth concedes that osteopaths are qualified to perform abortions. Brief for Appellees at 34; Stipulation ¶¶ 56–57, App. at 84–85a. The Commonwealth contends that because osteopathic physicians are included in the general definition of "physician" as "an individual licensed under the laws of this Commonwealth to engage ... in the practice of osteopathy or osteopathic surgery ...," contained in the Statutory Construction Act, 1 Pa.Cons.Stat. Ann. § 1991 (Purdon Supp.1982),[11] they are also within the class of "physicians" allowed to perform abortions under the Abortion Control Act.

The language of the abortion statute undercuts the Commonwealth's position. It requires that the physician be "licensed to practice medicine," which, under Pennsylvania law, is distinguished, for some purposes, from being "licensed to practice osteopathic medicine," 63 Pa.Stat.Ann. § 421.17, even though the disciplines substantially overlap. The two branches are regulated by different acts, the Medical Practice Act, 63 Pa.Cons.Stat.Ann. §§ 471.-1–.18 (Purdon Supp.1983), and the Osteopathic Practice Act, 63 Pa.Cons.Stat.Ann. §§ 271.1–.18 (Purdon Supp.1983), which establish separate regulatory bodies and qualifications.

Furthermore, the suggestion that the legislature intended to include osteopaths as "physicians" is inconsistent with the Act's disciplinary sanctions, which include license suspension and revocation under the Medical Practice Act but not under the Osteopathic Medical Practice Act. *See* Abortion Control Act, 18 Pa.Cons.Stat.Ann. §§ 3204(d), 3205(c), 3206(i), 3209, 3211(b), 3213(c), 3214(i), 3219(a). The Medical Practice Act, by its express terms, does not apply to osteopathy. 63 Pa.Cons.Stat.Ann. § 421.17(a)(6).

In light of this statutory structure, and in the absence of a narrowing construction by Pennsylvania courts, we are unable to

---

**11.** Section 1991 incorporates the definition of "osteopathy" in the Act of March 19, 1909, No. 29, 1909 Pa.Laws 46, (codified as amended at 63 Pa.Cons.Stat.Ann. § 266 (Purdon 1968)), which was repealed in 1978. The broad definition there provided that licensed osteopaths could practice "operative surgery, obstetrics, and the use of drugs without restriction. The phrase 'osteopathy and surgery' as used in this act means a complete school of the healing art applicable to all types and conditions of disease and disorders, and practiced as authorized here-

in by *physicians and surgeons possessing the degree of doctor of osteopathy"* (emphasis added). *See Commonwealth v. Cohen,* 142 Pa.Super. 199, 202–03, 15 A.2d 730, 732–33 (1940) (osteopaths have the standing of "physicians"). That Act was replaced by the Osteopathic Medical Practice Act, 63 Pa.Cons.Stat.Ann. §§ 271.-1–.18 (Purdon Supp.1983), which although not specifically referred to in the Statutory Construction Act is consistent with the interpretation that all licensed osteopaths are "physicians." *See* 63 Pa.Cons.Stat.Ann. § 271.2.

adopt the construction of the district court that "physician" in the Abortion Control Act includes osteopaths. However, our conclusion does not require striking down the entire Act. The better approach to this underinclusive statute is the one suggested by the Commonwealth as in accord with legislative intent: to strike and enjoin enforcement of the definition of "physician" contained in section 3203, thereby returning the definition of physician to that generally applicable and contained in the Statutory Construction Act, which includes osteopaths. *See Califano v. Westcott*, 443 U.S. 76, 89, 99 S.Ct. 2655, 2663, 61 L.Ed.2d 382 (1979); *Snider v. Thornburgh*, 496 Pa. 159, 178–79, 436 A.2d 593, 602 (1981).

§ 3205: *Informed Consent*

■ The provision that an abortion can be performed only with the voluntary and informed consent of the woman, which appellants do not challenge, also requires that specific information be imparted to her in order to secure her informed consent.[12] The district court rejected appellants' challenge to this requirement on the ground that it was not shown to cause undue burden or expense. 552 F.Supp. at 798–800.

Section 3205(a)(1) sets forth five categories of information that must be provided, including "[t]he fact that there may be detrimental physical and psychological effects which are not accurately foreseeable" ((a)(1)(ii)), and "[t]he probable gestational age of the unborn child at the time the abortion is to be performed" ((a)(1)(iv)). Section 3205(a)(2) sets forth three additional categories of information that must be provided, including "[t]he fact that medical assistance benefits may be available for

prenatal care, childbirth and neonatal care" ((a)(2)(i)); "[t]he fact that the father is liable to assist in the support of her child, even in instances where the father has offered to pay for the abortion" ((a)(2)(ii)); and the fact that the woman has the right to review certain printed materials described in section 3208, which include, *e.g.*, "[g]eographically indexed materials designed to inform the woman of public and private agencies and services available to assist a woman through pregnancy, upon childbirth and while the child is dependent, including adoption agencies;" a statement that "[t]he Commonwealth of Pennsylvania strongly urges you to contact [these agencies] before making a final decision about abortion"; and "[m]aterials designed to inform the woman of the probable anatomical and physiological characteristics of the unborn child at two-week gestational increments from fertilization to full term, including any relevant information on the possibility of the unborn child's survival." *See* 18 Pa.Cons.Stat.Ann. § 3208 (incorporated by reference in § 3205(a)(2)(iii)).

No Supreme Court opinion has sustained a statutory provision prescribing in specific terms, as here, the types of information that should be provided to a pregnant woman seeking an abortion. Instead, in *Akron*, where the Court reviewed an ordinance requiring the provision of specific information, much of which parallels that required here,[13] the Court struck the provision in its entirety. The Court did so in reliance on two central precepts that have informed the abortion decisions since *Roe v. Wade* and *Doe v. Bolton:* first, the principle of

**12.** The Commonwealth concedes that the additional requirement for physician-only counseling and the 24-hour waiting period are unconstitutional. *See supra* IV.

**13.** For example, both the *Akron* ordinance and the Pennsylvania statute require, in addition to "the particular ... risks associated with [the procedure]," that the woman be specifically informed of psychological and physical effects including hemorrhage, risks to subsequent pregnancies and sterility. *See* Akron, Ohio Codified Ordinances §§ 1870.05(B)(5), 1870.05(C); 18 Pa. Cons.Stat.Ann. § 3205(a)(1)(ii)–(iii). Both re-

quire information as to agencies that offer alternatives to abortion. *See* Akron, Ohio Codified Ordinances § 1870.05(B)(7) (1978); 18 Pa.Cons. Stat.Ann. §§ 3205(a)(2)(iii), 3208(a)(1). Both require information as to the fetus' probable gestational age and the availability of detailed information as to the characteristics of the fetus. *Compare* Akron, Ohio Codified Ordinances §§ 1870.05(B)(2)–(3) (physician to inform of characteristics) *with* 18 Pa.Cons.Stat.Ann. §§ 3205(a)(1)(iv) and (a)(2)(iii) (physician to make available information as to characteristics spelled out in section 3208(a)(2)).

deference to the physician's medical judgment, which "may be exercised in light of all factors—physical, emotional, psychological, familial, and the woman's age—relevant to the well-being of the patient," and the concomitant need to allow "the attending physician the room he needs to make his best medical judgment," *Doe v. Bolton*, 410 U.S. at 192, 93 S.Ct. at 747, and second, the requirement that the state avoid regulations "designed to influence the woman's informed choice between abortion or childbirth." *Akron*, 103 S.Ct. at 2500.

As in *Akron*, "it is fair to say that much of the information required [availability of benefits, support liability, unforeseeable risks] is designed not to inform the woman's consent but rather to persuade her to withhold it altogether," an objection the Court found decisive in that case. 103 S.Ct. at 2500. Further, as in *Akron*, the specification of "a litany of information that the physician must recite to each woman regardless of whether in his judgment the information is relevant to her personal decision" imposes objectionable obstacles to "the responsibility of the physician to ensure that appropriate information is conveyed to his patient, depending on her particular circumstances." *Id.*

The *Akron* case reaffirms that the doctor/counselor must be given the opportunity to tailor the information given a patient to the exigencies of the case. Although some of the information listed in the Pennsylvania Act would be unobjectionable standing alone, *see, e.g.*, 18 Pa.Cons.Stat. Ann. § 3205(a)(1)(i) (name of physician who will perform the abortion), and although the state may require in general terms that the woman be provided with information needed to secure her consent, *Akron*, 103 S.Ct. at 2501, the informed consent provisions of section 3205, just as those in *Akron*, are not severable. *See id.* at 2501 n. 37. The entire scheme here and as incorporated in other sections defining voluntariness in terms of specific information to be provided is invalid, and cannot be enforced.

### § 3206: *Parental Consent*

In this provision, the Act requires unemancipated minors to obtain the consent of their parents or a court order before an abortion can be performed. Appellants argue that this section deprives minors who choose abortion of equal protection of the law because it singles out abortion as the only pregnancy-related medical procedure requiring third party consent. Although this particular challenge was not before the Court in *Akron* or *Ashcroft*, and was specifically reserved by the Court in *Bellotti v. Baird*, 443 U.S. 622, 650 n. 30, 99 S.Ct. 3035, 3052 n. 30, 61 L.Ed.2d 797 (1979) (*Bellotti II*), the Court has rejected challenges to abortion statutes based on different treatment in other contexts between abortions and other medical decisions. *See H.L. v. Matheson*, 450 U.S. 398, 412–13, 101 S.Ct. 1164, 1172–73, 67 L.Ed.2d 388 (1981) (distinction as to parental notice); *Harris v. McRae*, 448 U.S. 297, 325, 100 S.Ct. 2671, 2692, 65 L.Ed.2d 784 (1980) (abortion funding); *Planned Parenthood v. Danforth*, 428 U.S. at 66–67, 96 S.Ct. at 2839–40 (written consent to abortion).

█ Moreover, states are permitted to regulate a minor's exercise of her constitutional rights in a manner that would not be permissible in the case of an adult in light of the special consideration that minors need. The Court has held that consent or notice provisions are important protections for minors who, because of stress or ignorance of alternatives, may not be able intelligently to decide whether to have an abortion. *Id.; Bellotti II*, 443 U.S. at 640–41, 99 S.Ct. at 3046–47 (plurality opinion by Powell, J.); *see also Akron*, 103 S.Ct. at 2491 n. 10. Therefore, we reject appellants' equal protection challenge.

Appellants also contend the section is void for vagueness because the term "emancipation" is not defined in the Act. The same defect was alleged in *Ashcroft* but was rejected by the Court on the ground that the term had a clear meaning in Missouri common law. 103 S.Ct. at 2525 n. 18. Thus, the fact that in Pennsylvania, as in Missouri, "the question whether a

minor is emancipated turns upon the facts and circumstances of each individual case" does not make it vague as a matter of law. *Id.; see also Indiana Planned Parenthood Affiliates Association v. Pearson,* 716 F.2d 1127, 1140 (7th Cir.1983). We reject the vagueness challenge.

■ Appellants' challenge to the procedural inadequacies of this section causes us more concern. The state cannot impose a parental veto on the decision of a minor to undergo an abortion, *Bellotti II,* 443 U.S. at 649–50, 99 S.Ct. at 3051, and the state must provide an "alternative procedure whereby a pregnant mother may demonstrate that she is sufficiently mature to make the abortion decision herself or that, despite her immaturity, an abortion would be in her best interests." *Akron,* 103 S.Ct. at 2498. This alternative is particularly important because "there are few [other] situations in which denying a minor the right to make an important decision will have consequences so grave and indelible." *Bellotti II,* 443 U.S. at 642, 99 S.Ct. at 3048.

The Missouri statute upheld in *Ashcroft* establishing alternative court proceedings for minor consent contained detailed provisions assuring confidentiality and dispatch, establishing a clear and simple procedure for the minor to follow in setting forth her petition, and directing court personnel to assist the minor in preparing the petition. *Ashcroft,* 103 S.Ct. at 2519–20 n. 4, 2525–26. Comparable provisions are absent in the Pennsylvania statute. This difference is critical. To pass constitutional muster, the alternative judicial procedure must be an established and practical avenue and may not rely solely on generally stated principles of availability, confidentiality, and form.

However, in light of the Pennsylvania Act's provision requiring the Supreme Court of Pennsylvania to promulgate rules assuring confidentiality and promptness of disposition, we cannot hold that the provision is facially unconstitutional. We have been advised that the Pennsylvania Supreme Court has not yet enacted any rules

to fill in the gaps of the Pennsylvania statute. In fact, it appears that the only county to establish rules on its own also included a provision for notification of the parents or alleged father, *see* Local R. No. 16.3(B), C.P. Chester County, 13 Pa.Admin. Bull. 2187, 2190 (1983), an obligation that may obstruct, rather than implement, the requirement that an alternative decisionmaker be available. *See Indiana Planned Parenthood Affiliates Association v. Pearson,* 716 F.2d at 1132, 1139.

■ We cannot agree with the Commonwealth's suggestion that we regard a letter written by the then Chief Justice to the Common Pleas courts suggesting that the courts apply adoption rules "if applicable", *see* Letter from Hon. Henry X. O'Brien, Chief Justice, to Hon. Anthony R. Appel, President Judge, C.P. Lancaster County (Nov. 16, 1982), included in Supplemental Brief for Appellees (Exhibit A) as a satisfactory substitute for written and explicit rules that fill the statutory gap. Consequently, although we do not invalidate section 3206, its operation should be enjoined until the state promulgates regulations, without prejudice to the right of these or other plaintiffs to attempt to demonstrate in this action, if still pending, or in some future action, that the regulations are unconstitutional.

## § 3207(b): *Abortion Facilities, Reports*

■ The challenged portion of this section requires abortion facilities to file reports that are subject to public disclosure containing information regarding abortion facilities and their affiliates. Appellants contend this forced disclosure is likely to subject them to threats, reprisals or harassment from segments of the public opposing abortion.

We agree with the district court that there is no evidence in the record that this section will appreciably affect a woman's abortion decision. Appellants have not as yet demonstrated a nexus between the disclosure of such information and the chilling of constitutional rights. Therefore we find

inapposite *Brown v. Socialist Workers '74 Campaign Committee*, 103 S.Ct. 416 (1982), on which appellants rely, where the Court held that compelled disclosure of party contributor lists may reasonably lead to harassment based on associational ties. Since there has been no showing of any effect of the disclosure on the abortion decision, and the state has proffered the important justification that the provision will help insure that shoddy practitioners may not hide behind the corporate veil, we reject appellants' challenge.

§ 3208: *Printed Information*

■■■ This provision, discussed in connection with section 3205, fails for the reasons discussed there. We conclude it is inextricably intertwined with section 3205, and therefore cannot be severed. There is no certainty of any legislative intent that section 3208 should stand alone. We express no view as to whether the state may undertake an independent informational campaign relating to abortion, since it has not done so here.

§ 3210: *Abortion After Viability*

*Prohibition*

Section 3210(a) provides that "[a]ny person who intentionally, knowingly or recklessly performs or induces an abortion when the fetus is viable" commits a felony of the third degree. A physician has two "complete defense[s]": that he had "concluded in good faith, in his best medical judgment," that (1) "the unborn child was not viable at the time the abortion was performed or induced," or that (2) "the abortion was necessary to preserve maternal life or health."

In *Roe v. Wade*, the Court decided that the "important and legitimate interest [of the state] in protecting the potentiality of human life" becomes so compelling at viability that at this stage the state may proscribe abortions altogether, "except when it is necessary to preserve the life or health of the mother." 410 U.S. at 162, 164, 93 S.Ct. at 731, 732. Apparently because of this language, and its reiteration in the decisions that followed, appellants have not challenged the state's use of "viability" as the determining time when abortions are proscribed. Indeed, a statute that established the limit for performance of abortions in terms of the weeks of pregnancy would have been invalid. As the Court stated in *Danforth*, "[I]t is not the proper function of the legislature or the courts to place viability, which essentially is a medical concept, at a specific point in the gestation period." 428 U.S. at 64, 96 S.Ct. at 2839.

On the other hand, because of the uncertainty of the viability determination itself, a statute that imposes strict criminal and civil liability upon a physician for performing or inducing an abortion after viability may create a profound chilling effect on the willingness of physicians to perform abortions near the point of viability. *See Colautti v. Franklin*, 439 U.S. at 396, 99 S.Ct. at 686. Thus, we must be particularly cautious in scrutinizing these provisions to assure that they have not imposed or caused an impermissible restriction on acts that are constitutional. It is noteworthy that no Supreme Court case has upheld a criminal statute prohibiting abortion of a viable fetus. Each such statute considered either did not contain such a criminal provision effective at viability or was invalidated because there were fatal omissions in the statutory language or scheme. *See Danforth*, 428 U.S. at 81–84, 96 S.Ct. at 2846–48 (plurality); *id.* at 89, 96 S.Ct. at 2850 (Stewart J., concurring) (upholding definition of viability, but striking down criminal sanction as overbroad); *Colautti v. Franklin*, 439 U.S. at 396, 99 S.Ct. at 686 (striking down criminal sanction pertaining to viability as vague and potentially overbroad).[14] We therefore first consider

---

**14.** A Missouri statute containing such a sanction was at issue in *Ashcroft*. The Court did not address the general proscription of abortions after viability, *see* 103 S.Ct. at 2521, but upheld a provision requiring a second physician at viability and imposing penalties for violation. *Id.* at 2519 n. 3, 2521–22.

whether this provision suffers from the same defects.

The declaration of the prohibited act, i.e. abortion of a viable fetus, must be construed to incorporate the statutory definition of "viability" in section 3203. Appellants mount no independent challenge to that definition, and it parallels the definition of "viability" upheld in *Danforth*, 428 U.S. at 63, 96 S.Ct. at 2838.[15] Instead, appellants challenge the adequacy of the defenses, claiming that they are too narrow and are violative of due process. Appellants claim that section 3210(a) is unconstitutional because it places the burden on the defendant physician to prove his or her innocence. They argue that the Pennsylvania Act does not squarely place the burden of proving absence of medical necessity on the state.

In *United States v. Vuitch*, 402 U.S. 62, 91 S.Ct. 1294, 28 L.Ed.2d 601 (1971), the Court construed the District of Columbia's abortion ordinance, which also did not explicitly place upon the state the burden of proving the abortion was unnecessary. The Court, however, in construing the statute to uphold its constitutionality, reasoned that Congress could not have intended that a physician be required to prove his or her innocence, and held that the ordinance placed the burden on the prosecution to plead and prove the abortion was unnecessary. *Id.* at 70–71. Thereafter, in *Simopoulos v. Virginia*, 103 S.Ct. at 2535, the Court held that it was permissible to place the burden on the defendant to invoke medical necessity as a defense, if the burden of proof of lack of medical necessity then shifted to the prosecution.

■ We recognize that the Pennsylvania Supreme Court, unlike the Virginia Supreme Court, has not yet issued an authoritative construction that the burden of proof as to lack of necessity rests with the prose-

cution. We are confident that the Supreme Court of Pennsylvania, if and when confronted with the issue, will also construe the statute in the manner adopted by the Supreme Court of the United States and the Supreme Court of Virginia. Because we believe the statute must be read as placing on the prosecution the burden of proving absence of medical necessity, we reject appellant's challenge on this ground.

The second defense in § 3210(a) specifies that a physician may perform an abortion even after viability when necessary "to preserve maternal life or health." It is clear from the Supreme Court cases that "health" is to be broadly defined. As the Court stated in *Doe v. Bolton*, the factors relating to health include those that are "physical, emotional, psychological, familial, [as well as] the woman's age." 410 U.S. at 192, 93 S.Ct. at 747.

As appellants have noted in their challenge to section 3210(b), it is apparent that the Pennsylvania legislature was hostile to this definition. Section 3210(b) contains the statement, "The potential psychological or emotional impact on the mother of the unborn child's survival shall not be deemed a medical risk to the mother." Had the legislature imposed this qualification on the language "maternal ... health" in section 3210(a), we would have no hesitation in declaring that provision unconstitutional. However, since it does not so state, and we are bound to construe it as constitutional, if possible, we again rely with confidence on the Supreme Court of Pennsylvania to construe "health" as does the Supreme Court of the United States.

We remain deeply concerned, however, because it is not improbable that imposition of criminal sanctions on physicians for the abortion of a viable fetus may deter conscientious physicians from undertaking the

---

**15.** The definition of "viability" contained in § 3203 and incorporated in § 3210(a) must be distinguished from the Act's definition in § 3203 of "born alive" as referring to a "human being [who] was completely expelled or extracted from his or her mother and after such separation breathed or showed evidence of any of the

following: beating of the heart, pulsation of the umbilical cord, definite movement of voluntary muscles or any brain-wave activity." We express no view as to whether any sanctions may be imposed for conduct or omissions relating to a fetus that is "born alive."

**300**

risk of error when the pregnancy approaches the end of the second trimester. However, the record is silent on this issue. At this stage of the proceeding, and in light of the Supreme Court's reiteration of the state's power to prohibit abortion of a viable fetus unless medically necessary, we are compelled to reject any challenge to the facial validity of this provision. We express no view as to our holding were the appellants to produce convincing evidence of unconstitutional chill.

*"Significantly greater" risk*

■ Section 3210(b) requires that the method of abortion used when the fetus is viable must be that method most likely to result in the fetus being "aborted alive," [16] unless that procedure would result in a "significantly greater" risk to the mother. In *Colautti v. Franklin*, 439 U.S. at 400, 99 S.Ct. at 688, the Court held that the earlier Pennsylvania statute impermissibly required the doctor to "make a 'trade-off' between the woman's health and ... fetal survival." The new Pennsylvania statute, like the old, fails to require that maternal health be the paramount consideration.

The district court recognized that if the Act required the mother to bear any increased risk in order to save the fetus, it would be unconstitutional, and attempted to save the provision by construing "significantly" to mean "medically cognizable." Under that construction, if the abortion technique that would save the fetus involves an increased risk to a mother, then the procedure safest for the mother must be used.

Such a reading is inconsistent with the statutory language and the legislative intent reflected in that language. The legislature deliberately used the word "significantly" to modify the risk imposed on the mothers, and that adverb is patently not surplusage. In considering other sections of the statute, we have followed the principle of construing a statute, whenever possible, in such manner as to render it constitutional. However, that construction must be one to which the language of the statute

is reasonably susceptible, and which comports with the probable intent of the legislature. *See* 2A C. Sands, Sutherland Statutory Construction § 45.11. Otherwise, this court would itself be acting as a legislature. We conclude that the language of section 3210(b) is not susceptible to a construction that does not require the mother to bear an increased medical risk in order to save her viable fetus, and therefore hold section 3210(b) unconstitutional. In view of this ruling, we do not reach the other challenges raised by appellants to this section.

*Second physician for viable fetus*

Section 3210(c) requires, under penalty of prosecution for a felony, that a physician who performs an abortion using a method that "in his good faith judgment, does not preclude the possibility of the child surviving the abortion, shall arrange for the attendance ... of a second physician" whose task is to take "all reasonable steps ... to preserve the child's life and health." In *Ashcroft*, a majority of the Court upheld a provision of the Missouri statute requiring a second physician to be present whenever an abortion is to be performed upon a viable fetus. Six Justices (the four dissenting Justices and Justice Powell, with whom the Chief Justice joined) expressed the view that an exception to the second physician requirement for medical emergencies was a factor essential to its validity. The four dissenting Justices believed this critical requirement could not be implied. 103 S.Ct. at 2530–31. Justice Powell concluded that the existence of a clause in the same section requiring a physician to preserve the life of the fetus "provided that it does not pose an increased risk to the life and health of the woman" could reasonably be construed to supply a medical emergency exception to the second physician requirement. *Id.* at 2522 n. 8.

The Pennsylvania Act, like the Missouri Act, has no clearly expressed exception for the performance of an abortion of a viable fetus without the second physician in at-

---

**16.** The term "aborted alive" is not defined. We express no view as to its meaning or propriety.

tendance. We cannot with any confidence assume the legislature intended the clause in section 3210(a), providing a defense for abortions necessary to preserve maternal life or health, to be equally applicable to section 3210(c), the second physician requirement. The two provisions are separated by the intervening provision, section 3210(b) on degree of care, which on its face evinces the Pennsylvania legislature's unconstitutionally restrictive view of maternal health, a view not apparent in the parallel Missouri provision.

In light of this provision, the most reasonable construction we can make of the probable legislative intent is its willingness to permit an abortion of a viable fetus with the defense of preservation of maternal life or health, but unwillingness to apply such a broad defense to the specific restrictions or regulations pertaining to the abortion of a viable fetus, i.e., those in section 3210(b) and section 3210(c).[17]

■ As with section 3210(b), we conclude we cannot rewrite the statute enacted by the legislature, and thus hold section 3210(c) similarly invalid for failing to prevent a trade-off of maternal health for the possibility of fetal survival.[18]

### § 3211:  *Viability*

■ This section, incorporated by reference in section 3214(a)(8), requires a physician to report the basis for his determination "that a child is not viable" and if he has determined that a child is viable, to "report the basis for his determination that the abortion is necessary to preserve maternal life or health."[19] Even if we could read this section as requiring such reports only as to abortions performed subsequent to the first trimester of pregnancy, there is no important state interest furthered by requiring the physician to make such a report as to abortions of non-viable fetuses in the second trimester. The Commonwealth has adduced no evidence that there is a significant chance of viability throughout the second-trimester. The evaluation and reporting requirements of section 3211(a) cannot be substantially distinguished from those of section 3214 discussed *infra* and fall for the same reasons.

### § 3214:  *Reporting*

■ This section of the Act requires in (a), (b), and (h) detailed reporting with regard to each abortion performed irrespective of the stage of pregnancy. The physician must sign a report to be filed the following month, which includes fourteen categories of data, including but not limited to identification of the physician, facility, and referring physician, agency or service; the political subdivision and state in which the woman resides; her age, race and marital status; the number of her prior pregnancies; the date of her last menstrual period and probable gestational age of the unborn child; the type of procedure performed; complications; the "length and weight of the aborted unborn child when measurable"; the "[b]asis for any medical

17. The Pennsylvania Act does contain an entirely separate definition of "medical emergency" not incorporated in § 3201(c). Such "emergencies" are limited to abortions necessary "to avert the death of the mother" or prevent "grave peril of immediate and irreversible loss of major bodily function." Were this definition read as applicable to the second physician requirement, even though the statute does not so provide, it would give the woman's own physician insufficient room to protect her health.

18. We do not reach the question whether § 3210(c) unconstitutionally requires the presence of a second physician at a stage prior to viability by the phrase "method [that] does not preclude the possibility of the child surviving the abortion."

19. We believe Chief Judge Seitz too narrowly construes the scope of appellants' challenge to the reporting requirements. Two sections of the Act, §§ 3211 and 3214(a)(8), require the filing of the same viability reports. Appellants have consistently challenged, in its entirety, the requirement of individual reports to be filed for each abortion under section 3214(a). Complaint ¶¶ 121, 124, App. at 35a, 36a; Brief for Appellants at 43–44. Their briefs have also asserted a challenge in general terms to the undue burden of the Act's reporting requirements. Memorandum of Law in Support of Plaintiff's Motion for Preliminary Injunction at 98–107; Supplemental Brief for Appellants at 30–31.

judgment that a medical emergency existed," the viability report referred to in section 3211(a), and the method of payment for the abortion. Another detailed report must be filed by the physician as to each woman who has "complications" from an abortion or attempted abortion.

In *Danforth* the Court upheld certain recordkeeping requirements imposed by that act on health facilities and physicians, stating, "Recordkeeping and reporting requirements that are reasonably directed to the preservation of maternal health and that properly respect a patient's confidentiality and privacy are permissible." 428 U.S. at 80, 96 S.Ct. at 2846. However the Court characterized the Missouri Act's recordkeeping, later described in *Akron* as "minor regulations", 103 S.Ct. at 2493 & n. 13, as "approaching impermissible limits". 428 U.S. at 81, 96 S.Ct. at 2846.

The statute challenged in *Danforth* merely provided generally for recordkeeping by health facilities and physicians concerned with abortions on forms to be supplied for the functions of "preservation of maternal health and life by adding to the sum of medical knowledge through the compilation of relevant maternal health and life data" and monitoring abortions to assure that they are done in accordance with the provisions of the law. 428 U.S. at 87, 96 S.Ct. at 2849. That Act required no recordkeeping close to the extent imposed by the Pennsylvania Act. The Court cautioned that recordkeeping and record-maintaining provisions must not be "utilized in such a way as to accomplish, through the sheer burden of recordkeeping detail, what we have held to be an otherwise unconstitutional restriction." *Id.* at 81, 96 S.Ct. at 2847.

The nature and complexity of the reporting requirements of the Pennsylvania Act have crossed the permissible threshold. The district court here upheld the recordkeeping required in section 3214 as "relat-

ed to the state's interest in protecting the health of its citizens." 552 F.Supp. at 804. The appropriate test is whether these detailed reporting requirements have a significant impact on the woman's abortion decision.

The parties have stipulated that the reporting requirements will increase the costs of the abortions. Stipulation ¶ 194. The state has proffered no compelling state interest to justify much of the detail required. There are additional objections to some of the specific information required. For example, the compulsion that a physician report the basis for his or her medical judgment at various stages appears inconsistent with the Court's directive that a physician be accorded broad discretion, and could have a profound chilling effect on the willingness of physicians to perform abortions. *See Colautti v. Franklin,* 439 U.S. at 396, 99 S.Ct. at 686. In light of our conclusion, we do not consider appellants' challenge that these provisions also invade the mother's and doctor's privacy.

Appellants have withdrawn their challenge to (c), and presumably also to its implementation in (d), based on the *Ashcroft* decision, which upheld a requirement that all tissue surgically removed during an abortion be sent to a certified pathologist for examination. Supplemental Brief for Appellants at 17 n. 5.[20] They have not separately challenged before us the requirement of quarterly statistical reports to be filed by each facility in which an abortion is performed (f), and the requirement of reports of maternal deaths (g). These provisions are severable from the remainder of section 3214. However, (e) requiring compilation and disclosure of the data gathered under (a) cannot be severed from (a) and therefore also falls.

§ 3215(e): *Insurance*

This provision requires health and disability insurers in Pennsylvania to make available policies that exclude coverage of

---

**20.** In light of appellants' position, we do not consider the apparent difference between the purpose of the Pennsylvania provision, which appears to be directed to enforcement of the statute's viability provisions, and that in the Missouri Act, which was found to be directed to maternal health. *Ashcroft,* 103 S.Ct. at 2524–25.

elective abortions except in case of rape or incest. The statute also requires that these policies cost less than policies that offer comprehensive abortion coverage. The parties have stipulated that the actuarial cost of insurance without comprehensive abortion coverage may be higher or lower than insurance with comprehensive abortion coverage. Stipulation ¶¶ 189–91.

■■■ Appellant Plant, who averred that she has health insurance including comprehensive coverage for abortion, challenges this provision.[21] The district court concluded that this provision would not impose a legally significant burden on a woman's right to seek an abortion, and that it is "rationally related to the public policy of the Commonwealth encouraging childbirth over abortion." 552 F.Supp. at 809.

■■■ The state generally need not commit public funds to abortion, and may in this respect choose childbirth over abortion as a matter of policy. *See Harris v. McRae*, 448 U.S. 297, 316–17, 100 S.Ct. 2671, 2687–88, 65 L.Ed.2d 784 (1980); *Maher v. Roe*, 432 U.S. 464, 474, 97 S.Ct. 2376, 2382, 53 L.Ed.2d 484 (1977). However, this choice was only permissible in these cases "because it did not add any 'restriction on access to abortion that was not already there.'" *Akron*, 103 S.Ct. at 2500 n. 33 (quoting *Maher*, 432 U.S. at 474, 97 S.Ct. at 2382). Pennsylvania has gone further in favoring childbirth over abortion, and has imposed a requirement on private insurers to issue policies that do not cover abortions and that cost *less* than policies which do cover them. This requirement adds an additional barrier to a woman's access to an abortion and is unconstitutional. The state has produced no adequate justification for the required lower cost, conceding that the real cost of such policies may be higher.

*See* Stipulation § 189–91. Thus, insurance costs for women who wish abortion coverage may rise. Because the right to an abortion is "fundamental," the state's assertion that the legislature may have concluded that costs *may* be lower for such policies is insufficient to withstand constitutional scrutiny.

For the above reasons we are obliged to declare section 3215(e) unconstitutional.

### VI.

### SUMMARY

The foregoing lengthy analysis was dictated by the necessity of seriatim consideration of each of the challenged provisions of the statute. The Pennsylvania legislature chose to enact a complex and extensive regulatory scheme with severe criminal sanctions containing numerous provisions which it had been advised skirted constitutional limits. We have, when possible, attempted to give effect to the legislative intent when the provision itself is permissible. Thus we have rejected appellants' general challenges that would have vitiated the entire Act. We have sustained the provision proscribing abortions after viability, and have sustained the provision requiring abortion facilities to file reports subject to public disclosure. Other reporting provisions that have not been challenged will also be operative. Similarly we have rejected the facial challenges to the minor consent provision, which can be effectuated as soon as the Pennsylvania Supreme Court fills the legislative gap with rules that rectify the procedural inadequacies.

At the same time we cannot overlook the legislature's unduly restrictive view of the right of a pregnant woman aided by her

---

**21.** We reject appellees' challenge to Plant's standing and the district court's suggestion that she did not allege sufficient injury in fact. The Commonwealth has passed a provision aimed at influencing the conduct of insureds to choose childbirth over abortion, and has stipulated that a foreseeable result is an increase in the cost of insurance to women, such as Plant, who purchase abortion coverage. This increased cost caused by a provision directed at her is sufficient injury in fact and places her within the zone of interests of the regulation. *See Columbia Broadcasting System v. United States*, 316 U.S. 407, 422, 62 S.Ct. 1194, 1202, 86 L.Ed. 1563 (1942); *Colonial Penn Insurance Co. v. Heckler*, 721 F.2d 431 (3d Cir.1983); *Cotovsky-Kaplan Physical Therapy Associates v. United States*, 507 F.2d 1363, 1367 (7th Cir.1975).

physician to effectuate her fundamental constitutional right to an abortion. The exceedingly detailed reporting provisions, the requirement of discriminatory insurance, the compulsion that the physician or agent provide specified information to the pregnant woman, and the attempt to control the method of abortion and mandate the attendance of a second physician in a manner trading off the woman's health for that of the fetus, represent unacceptable legislative encroachments upon the woman's constitutional right and interfere with the physician-patient relationship.

We believe that the result reached here represents a delicate accommodation between permissible regulation and control of abortions on the one hand and vindication of the woman's right on the other hand. We will remand this case to the district court for further proceedings in accordance with this opinion.

## APPENDIX

### RELEVANT SECTIONS OF THE ABORTION CONTROL ACT

18 Pa.Cons.Stat.Ann. §§ 3201–3220

### § 3202. Legislative intent

(a) Rights and interests.—It is the intention of the General Assembly of the Commonwealth of Pennsylvania to protect hereby the life and health of the woman subject to abortion and to protect the life and health of the child subject to abortion. It is the further intention of the General Assembly to foster the development of standards of professional conduct in a critical area of medical practice, to provide for development of statistical data and to protect the right of the minor woman voluntarily to decide to submit to abortion or to carry her child to term. The General Assembly finds as fact that the rights and interests furthered by this chapter are not secure in the context in which abortion is presently performed.

(b) Conclusions.—Reliable and convincing evidence has compelled the General Assembly to conclude and the General Assembly does hereby solemnly declare and find that:

(1) Many women now seek or are encouraged to undergo abortions without full knowledge of the development of the unborn child or of alternatives to abortion.

(2) The gestational age at which viability of an unborn child occurs has been lowering substantially and steadily as advances in neonatal medical care continue to be made.

(3) A significant number of late-term abortions result in live births, or in delivery of children who could survive if measures were taken to bring about breathing. Some physicians have been allowing these children to die or have been failing to induce breathing.

(4) Because the Commonwealth places a supreme value upon protecting human life, it is necessary that those physicians which it permits to practice medicine be held to precise standards of care in cases where their actions do or may result in the death of an unborn child.

(5) A reasonable waiting period, as contained in this chapter, is critical to the assurance that a woman elect to undergo an abortion procedure only after having the fullest opportunity to give her informed consent thereto.

(c) Construction.—In every relevant civil or criminal proceeding in which it is possible to do so without violating the Federal Constitution, the common and statutory law of Pennsylvania shall be construed so as to extend to the unborn the equal protection of the laws and to further the public policy of this Commonwealth encouraging childbirth over abortion.

(d) Right of conscience.—It is the further public policy of the Commonwealth of Pennsylvania to respect and protect the right of conscience of all persons who refuse to obtain, receive, subsidize, accept or provide abortions including those persons who are engaged in the delivery of medical services and medical care whether acting individually, corporately or in association with other persons; and to prohibit all

forms of discrimination, disqualification, coercion, disability or imposition of liability or financial burden upon such persons or entities by reason of their refusing to act contrary to their conscience or conscientious convictions in refusing to obtain, receive, subsidize, accept or provide abortions.

### § 3203. Definitions

The following words and phrases when used in this chapter shall have, unless the context clearly indicates otherwise, the meanings given to them in this section:

"Abortion." The use of any means to terminate the clinically diagnosable pregnancy of a woman with knowledge that the termination by those means will, with reasonable likelihood, cause the death of the unborn child except that, for the purposes of this chapter, abortion shall not mean the use of an intrauterine device or birth control pill to inhibit or prevent ovulation, fertilization or the implantation of a fertilized ovum within the uterus.

"Born alive." When used with regard to a human being, means that the human being was completely expelled or extracted from her or his mother and after such separation breathed or showed evidence of any of the following: beating of the heart, pulsation of the umbilical cord, definite movement of voluntary muscles or any brain-wave activity.

. . . .

"Facility" or "medical facility." Any public or private hospital, clinic, center, medical school, medical training institution, health care facility, physician's office, infirmary, dispensary, ambulatory surgical treatment center or other institution or location wherein medical care is provide to any person.

. . . .

"First trimester." The first 12 weeks of gestation.

"Hospital." An institution licensed pursuant to the provisions of the law of this Commonwealth.

. . . .

"Medical emergency." That condition which, on the basis of the physician's best clinical judgment, so complicates a pregnancy as to necessitate the immediate abortion of same to avert the death of the mother or for which a 24-hour delay will create grave peril of immediate and irreversible loss of major bodily function.

"Medical personnel." Any nurse, nurse's aide, medical school student, professional or any other person who furnishes, or assists in the furnishing of, medical care.

"Physician." Any person licensed to practice medicine in this Commonwealth.

. . . .

"Probable gestational age of the unborn child." What, in the judgment of the attending physician, will with reasonable probability be the gestational age of the unborn child at the time the abortion is planned to be performed.

"Unborn child." For purposes of this chapter, a human being from fertilization until birth and includes a fetus.

"Viability." That stage of fetal development when, in the judgment of the physician based on the particular facts of the case before him and in light of the most advanced medical technology and information available to him, there is a reasonable likelihood of sustained survival of the unborn child outside the body of his or her mother, with or without artificial support.

### § 3205. Informed consent

(a) General rule.—No abortion shall be performed or induced except with the voluntary and informed consent of the woman upon whom the abortion is to be performed or induced. Except in the case of a medical emergency, consent to an abortion is voluntary and informed if and only if:

(1) The woman is provided, at least 24 hours before the abortion, with the following information by the physician who is to perform the abortion or by the referring physician but not by the agent or representative of either.

(i) The name of the physician who will perform the abortion.

(ii) The fact that there may be detrimental physical and psychological effects which are not accurately foreseeable.

(iii) The particular medical risks associated with the particular abortion procedure to be employed including, when medically accurate, the risks of infection, hemorrhage, danger to subsequent pregnancies and infertility.

(iv) The probable gestational age of the unborn child at the time the abortion is to be performed.

(v) The medical risks associated with carrying her child to term.

(2) The woman is informed, by the physician or his agent, at least 24 hours before the abortion:

(i) The fact that medical assistance benefits may be available for prenatal care, childbirth and neonatal care. ·

(ii) The fact that the father is liable to assist in the support of her child, even in instances where the father has offered to pay for the abortion.

(iii) That she has the right to review the printed materials described in section 3208 (relating to printed information). The physician or his agent shall orally inform the woman that the materials describe the unborn child and list agencies which offer alternatives to abortion. If the woman chooses to view the materials, copies of them shall be furnished to her. If the woman is unable to read the materials furnished her, the materials shall be read to her. If the woman seeks answers to questions concerning any of the information or materials, answers shall be provided her in her own language.

(3) The woman certifies in writing, prior to the abortion, that the information described in paragraphs (1) and (2) has been furnished her, and that she has been informed of her opportunity to review the information referred to in paragraph (2).

(4) Prior to the performance of the abortion, the physician who is to perform or induce the abortion or his agent receives a copy of the written certification prescribed by paragraph (3).

(b) Emergency.—Where a medical emergency compels the performance of an abortion, the physician shall inform the woman, prior to the abortion if possible, of the medical indications supporting his judgment that an abortion is necessary to avert her death.

(c) Penalty.—Any physician who violates the provisions of this section is guilty of "unprofessional conduct" and his license for the practice of medicine and surgery shall be subject to suspension or revocation in accordance with procedures provided under the act of July 20, 1974 (P.L. 551, No. 190), known as the "Medical Practice Act of 1974." Any other person obligated under this chapter to give information relating to informed consent to a woman before an abortion is performed, and who fails to give such information, shall, for the first offense be guilty of a summary offense and, for each subsequent offense, be guilty of a misdemeanor of the third degree.

(d) Limitation on civil liability.—Any physician who complies with the provisions of this section may not be held civilly liable to his patient for failure to obtain informed consent to the abortion within the meaning of that term as defined by the act of October 15, 1975 (P.L. 390, No. 111), known as the "Health Care Services Malpractice Act."

§ 3206. Parental consent

(a) General rule.—Except in the case of a medical emergency except as provided in this section, if a pregnant woman is less than 18 years of age and not emancipated, or if she has been adjudged an incompetent under 20 Pa.C.S. § 5511 (relating to petition and hearing; examination by court-appointed physician), a physician shall not perform an abortion upon her unless, in the case of a woman who is less than 18 years of age, he first obtains the consent both of the pregnant woman and of one of her parents; or, in the case of a woman who is incompetent, he first obtains the consent of her guardian. In deciding whether to grant such consent, a pregnant woman's

parent or guardian shall consider only their child's or ward's best interests. In obtaining the consent of the woman's parent or guardian, the physician shall provide them the information and materials specified in section 3205 (relating to informed consent), and shall further obtain from them the certification required by section 3205(a)(3). In the case of a pregnancy that is the result of incest where the father is a party to the incestuous act, the pregnant woman need only obtain the consent of her mother.

(b) Unavailability of parent or guardian. —If both parents have died or are otherwise unavailable to the physician within a reasonable time and in a reasonable manner, consent of the pregnant woman's guardian or guardians shall be sufficient. If the pregnant woman's parents are divorced, consent of the parent having custody shall be sufficient. If neither any parent nor a legal guardian is available to the physician within a reasonable time and in a reasonable manner, consent of any adult person standing in loco parentis shall be sufficient.

(c) Petition to court for consent.—If both of the parents or guardians of the pregnant woman refuse to consent to the performance of an abortion or if she elects not to seek the consent of either of her parents or of her guardian, the court of common pleas of the judicial district in which the applicant resides or in which the abortion is sought shall, upon petition or motion, after an appropriate hearing, authorize a physician to perform the abortion if the court determines that the pregnant woman is mature and capable of giving informed consent to the proposed abortion, and has, in fact, given such consent.

(d) Court order.—If the court determines that the pregnant woman is not mature and capable of giving informed consent or if the pregnant woman does not claim to be mature and capable of giving informed consent, the court shall determine whether the performance of an abortion upon her would be in her best interests. If the court determines that the performance of an abortion would be in the best interests of the wom-an, it shall authorize a physician to perform the abortion.

(e) Representation in proceedings.—The pregnant woman may participate in proceedings in the court on her own behalf and the court may appoint a guardian ad litem for her. The court shall, however, advise her that she has a right to court appointed counsel and shall, upon her request, provide her with such counsel.

(f) Proceedings confidential.—Court proceedings under this section shall be confidential and shall be given such precedence over other pending matters as will ensure that the court may reach a decision promptly and without delay in order to serve the best interests of the pregnant woman, but in no case shall the court fail to rule within three business days of the date of application. A court of common pleas which conducts proceedings under this section shall make in writing specific factual findings and legal conclusions supporting its decision and shall order a sealed record of the evidence to be maintained which shall include its own findings and conclusions.

(g) Coercion prohibited.—Except in a medical emergency, no parent, guardian or other person standing in loco parentis shall coerce a minor or incompetent woman to undergo an abortion. The court shall grant such relief as may be necessary to prevent such coercion. Should a minor be denied the financial support of her parents by reason of her refusal to undergo abortion, she shall be considered emancipated for purposes of eligibility for assistance benefits.

(h) Regulation of proceedings.—No filing fees shall be required of any woman availing herself of the procedures provided by this section. An expedited confidential appeal shall be available to any pregnant woman whom the court denies an order authorizing an abortion. The Supreme Court of Pennsylvania shall issue promptly such rules as may be necessary to assure that the process provided in this section is conducted in such a manner as will ensure confidentiality and sufficient precedence

over other pending matters to ensure promptness of disposition.

(i) Penalty.—Any person who performs an abortion upon a woman who is an unemancipated minor or incompetent to whom this section applies either with knowledge that she is a minor or incompetent to whom this section applies, or with reckless disregard or negligence as to whether she is a minor or incompetent to whom this section applies, and who intentionally, knowingly or recklessly fails to conform to any requirement of this section is guilty of "unprofessional conduct" and his license for the practice of medicine and surgery shall be suspended in accordance with procedures provided under the act of July 20, 1974 (P.L. 551, No. 190), known as the "Medical Practice Act of 1974," for a period of at least three months. Failure to comply with the requirements of this section is prima facie evidence of failure to obtain informed consent and of interference with family relations in appropriate civil actions. The law of this Commonwealth shall not be construed to preclude the award of exemplary damages or damages for emotional distress even if unaccompanied by physical complications in any appropriate civil action relevant to violations of this section. Nothing in this section shall be construed to limit the common law rights of parents.

### § 3207. Abortion facilities

. . . .

(b) Reports.—Within 30 days after the effective date of this chapter, every facility at which abortions are performed shall file, and update immediately upon any change, a report with the department, which shall be open to public inspection and copying, containing the following information:

(1) Name and address of the facility.

(2) Name and address of any parent, subsidiary or affiliated organizations, corporations or associations.

(3) Name and address of any parent, subsidiary or affiliated organizations, corporations or associations having contemporaneous commonality of ownership, beneficial interest, directorship or officership with any other facility.

Any facility failing to comply with the provisions of this subsection shall be assessed by the department a fine of $500 for each day it is in violation hereof.

### § 3208. Printed information

(a) General Rule.—The department shall cause to be published in English, Spanish and Vietnamese, within 60 days after this chapter becomes law, the following easily comprehensible printed materials:

(1) Geographically indexed materials designed to inform the woman of public and private agencies and services available to assist a woman through pregnancy, upon childbirth and while the child is dependent, including adoption agencies, which shall include a comprehensive list of the agencies available, a description of the services they offer and a description of the manner, including telephone numbers, in which they might be contacted, or, at the option of the department, printed materials including a toll-free 24-hour a day telephone number which may be called to obtain, orally, such a list and description of agencies in the locality of the caller and of the services they offer. The materials shall include the following statement:

"There are many public and private agencies willing and able to help you to carry your child to term, and to assist you and your child after your child is born, whether you choose to keep your child or to place her or him for adoption. The Commonwealth of Pennsylvania strongly urges you to contact them before making a final decision about abortion. The law requires that your physician or his agent give you the opportunity to call agencies like these before you undergo an abortion."

(2) Materials designed to inform the woman of the probable anatomical and physiological characteristics of the unborn child at two-week gestational increments from fertilization to full term, including any relevant information on the

possibility of the unborn child's survival. The materials shall be objective, nonjudgmental and designed to convey only accurate scientific information about the unborn child at the various gestational ages.

. . . .

### § 3209. Abortion after first trimester

All abortions subsequent to the first trimester of pregnancy shall be performed, induced and completed in a hospital. Except in cases of good faith judgment that a medical emergency exists, any physician who performs such an abortion in a place other than a hospital is guilty of "unprofessional conduct" and his license for the practice of medicine and surgery shall be subject to suspension or revocation in accordance with procedures provided under the act of July 20, 1974 (P.L. 551, No. 190), known as the "Medical Practice Act of 1974."

### § 3210. Abortion after viability

(a) Prohibition; penalty.—Any person who intentionally, knowingly or recklessly performs or induces an abortion when the fetus is viable commits a felony of the third degree. It shall be a complete defense to any charge brought against a physician for violating the requirements of this section that he had concluded in good faith, in his best medical judgment, that the unborn child was not viable at the time the abortion was performed or induced or that the abortion was necessary to preserve maternal life or health.

(b) Degree of care.—Every person who performs or induces an abortion after an unborn child has been determined to be viable shall exercise that degree of professional skill, care and diligence which such person would be required to exercise in order to preserve the life and health of any unborn child intended to be born and not aborted and the abortion technique employed shall be that which would provide the best opportunity for the unborn child to be aborted alive unless, in the good faith judgment of the physician, that method or technique would present a significantly greater medical risk to the life or health of the pregnant woman than would another available method or technique and the physician reports the basis for his judgment. The potential psychological or emotional impact on the mother of the unborn child's survival shall not be deemed a medical risk to the mother. Any person who intentionally, knowingly or recklessly violates the provisions of this subsection commits a felony of the third degree.

(c) Second physician.—Any person who intends to perform an abortion the method chosen for which, in his good faith judgment, does not preclude the possibility of the child surviving the abortion, shall arrange for the attendance, in the same room in which the abortion is to be completed, of a second physician. Immediately after the complete expulsion or extraction of the child, the second physician shall take control of the child and shall provide immediate medical care for the child, taking all reasonable steps necessary, in his judgment, to preserve the child's life and health. Any person who intentionally, knowingly or recklessly violates the provisions of this subsection commits a felony of the third degree.

### § 3211. Viability

(a) Determination of viability.—Prior to performing any abortion upon a woman subsequent to her first trimester of pregnancy, the physician shall determine whether, in his good faith judgment, the child is viable. When a physician has determined that a child is viable, he shall report the basis for his determination that the abortion is necessary to preserve maternal life or health. When a physician has determined that a child is not viable, he shall report the basis for such determination.

(b) Unprofessional conduct.—Failure of any physician to conform to any requirement of this section constitutes "unprofessional conduct" within the meaning of the act of July 20, 1974 (P.L. 551, No. 190), known as the "Medical Practice Act of 1974." Upon a finding by the State Board of Medical Education and Licensure that

any physician has failed to conform to any requirement of this section, the board shall not fail to suspend that physician's license for a period of at least three months. Intentional, knowing or reckless falsification of any report required under this section is a misdemeanor of the third degree.

### § 3214. Reporting

(a) General rule.—A report of each abortion performed shall be made to the department on forms prescribed by it. The report forms shall not identify the individual patient by name and shall include the following information:

(1) Identification of the physician who performed the abortion and the facility where the abortion was performed and of the referring physician, agency or service, if any.

(2) The political subdivision and state in which the woman resides.

(3) The woman's age, race and marital status.

(4) The number of prior pregnancies.

(5) The date of the woman's last menstrual period and the probable gestational age of the unborn child.

(6) The type of procedure performed or prescribed and the date of the abortion.

(7) Complications, if any, including but not limited to, rubella disease, hydatid mole, endocervical polyp and malignancies.

(8) The information required to be reported under section 3211(a) (relating to viability).

(9) The length and weight of the aborted unborn child when measurable.

(10) Basis for any medical judgment that a medical emergency existed as required by any part of this chapter.

(11) The date of the medical consultation required by section 3204(b) (relating to medical consultation and judgment).

(12) The date on which any determination of pregnancy was made.

(13) The information required to be reported under section 3210(b) (relating to abortion after viability).

(14) Whether the abortion was paid for by the patient, by medical assistance, or by medical insurance coverage.

(b) Completion of report.—The reports shall be completed by the hospital or other licensed facility, signed by the physician who performed the abortion and transmitted to the department within 15 days after each reporting month.

(c) Pathological examinations.—When there is an abortion performed during the first trimester of pregnancy, the tissue that is removed shall be subjected to a gross or microscopic examination, as needed, by the physician or a qualified person designated by the physician to determine if a pregnancy existed and was terminated. If the examination indicates no fetal remains, that information shall immediately be made known to the physician and sent to the department within 15 days of the analysis. When there is an abortion performed after the first trimester of pregnancy where the physician has certified the unborn child is not viable, the dead unborn child and all tissue removed at the time of the abortion shall be submitted for tissue analysis to a board eligible or certified pathologist. If the report reveals evidence of viability or live birth, the pathologist shall report such findings to the department within 15 days and a copy of the report shall also be sent to the physician performing the abortion. Intentional, knowing, reckless or negligent failure of the physician to submit such an unborn child or such tissue remains to such a pathologist for such a purpose, or intentional knowing or reckless failure of the pathologist to report any evidence of live birth or viability to the department in the manner and within the time prescribed is a misdemeanor of the third degree.

(d) Form.—The department shall prescribe a form on which pathologists may report any evidence of absence of pregnancy, live birth or viability.

(e) Statistical reports; public availability of reports.—

(1) The department shall prepare an annual statistical report for the General Assembly based upon the data gathered

under subsection (a). Such report shall not lead to the disclosure of the identity of any person filing a report or about whom a report is filed, and shall be available for public inspection and copying.

(2) Reports filed pursuant to subsection (a) shall not be deemed public records within the meaning of that term as defined by the act of June 21, 1957 (P.L. 390, No. 212), referred to as the Right-to-Know Law, but shall be made available for public inspection and copying within 15 days of receipt in a form which will not lead to the disclosure of the identity of any person filing a report. On those reports available for public inspection and copying, the department shall substitute for the name of any physician which appears on the report, a unique identifying number. The identity of the physician shall constitute a confidential record of the department. The department may set a reasonable per copy fee to cover the cost of making any copies authorized hereunder.

(3) Original copies of all reports filed under subsection (a) shall be available to the State Board of Medical Education and Licensure, and to law enforcement officials, for use in the performance of their official duties.

(4) Any person who willfully discloses any information obtained from reports filed pursuant to subsection (a), other than that disclosure authorized under paragraph (1), (2) or (3) hereof or as otherwise authorized by law, shall commit a misdemeanor of the third degree.

(f) Report by facility.—Every facility in which an abortion is performed within this Commonwealth during any quarter year shall file with the department a report showing the total number of abortions performed within the hospital or other facility during that quarter year. This report shall also show the total abortions performed in each trimester of pregnancy. These reports shall be available for public inspection and copying.

(g) Report of maternal death.—After 30 days' public notice, the department shall henceforth require that all reports of maternal deaths occurring within the Commonwealth arising from pregnancy, childbirth or intentional abortion in every case state the cause of death, the duration of the woman's pregnancy when her death occurred and whether or not the woman was under the care of a physician during her pregnancy prior to her death and shall issue such regulations as are necessary to assure that such information is reported, conducting its own investigation if necessary in order to ascertain such data. A woman shall be deemed to have been under the care of a physician prior to her death for the purpose of this chapter when she had either been examined or treated by a physician, not including any examination or treatment in connection with emergency care for complications of her pregnancy or complications of her abortion, preceding the woman's death at any time which is both 21 or more days after the time she became pregnant and within 60 days prior to her death. Known incidents of maternal mortality of nonresident women arising from induced abortion performed in this Commonwealth shall be included as incidents of maternal mortality arising from induced abortions. Incidents of maternal mortality arising from continued pregnancy or childbirth and occurring after induced abortion has been attempted but not completed, including deaths occurring after induced abortion has been attempted but not completed as a result of ectopic pregnancy, shall be included as incidents of maternal mortality arising from induced abortion. The department shall annually compile a statistical report for the General Assembly based upon the data gathered under this subsection, and all such statistical reports shall be available for public inspection and copying.

(h) Report of complications.—Every physician who is called upon to provide medical care or treatment to a woman who is in need of medical care because of a complication or complications resulting, in the good faith judgment of the physician, from having undergone an abortion or attempted abortion shall prepare a report thereof and file the report with the department within

30 days of the date of his first examination of the woman, which report shall be open to public inspection and copying and shall be on forms prescribed by the department, which forms shall contain the following information, as received, and such other information except the name of the patient as the department may from time to time require:

(1) Age of patient.

(2) Number of pregnancies patient may have had prior to the abortion.

(3) Number and type of abortions patient may have had prior to this abortion.

(4) Name and address of the facility where the abortion was performed.

(5) Gestational age of the unborn child at the time of the abortion, if known.

(6) Type of abortion performed, if known.

(7) Nature of complication or complications.

(8) Medical treatment given.

(9) The nature and extent, if known, of any permanent condition caused by the complication.

(i) Penalties.—

(1) Any person required under this section to file a report, keep any records or supply any information, who willfully fails to file such report, keep such records or supply such information at the time or times required by law or regulation is guilty of "unprofessional conduct" and his license for the practice of medicine and surgery shall be subject to suspension or revocation in accordance with procedures provided under the act of July 20, 1974 (P.L. 551, No. 190), known as the "Medical Practice Act of 1974."

(2) Any person who willfully delivers or discloses to the department any report, record or information known by him to be false commits a misdemeanor of the first degree.

(3) In addition to the above penalties, any person, organization or facility who willfully violates any of the provisions of this section requiring reporting shall upon conviction thereof:

(i) For the first time, have its license suspended for a period of six months.

(ii) For the second time, have its license suspended for a period of one year.

(iii) For the third time, have its license revoked.

§ 3215. *Publicly owned facilities; public officials and public funds.*

. . . .

(e) Insurance policies.—All insurers who make available health care and disability insurance policies in this Commonwealth shall make available such policies which contain an express exclusion of coverage for abortion services not necessary to avert the death of the woman or to terminate pregnancies caused by rape or incest. Any such policy shall contain a premium which is lower than that which is contained in policies offering additional abortion coverage.

. . . .

SEITZ, Chief Judge, dissenting in part.

I concur in most of the majority's opinion, but I write separately for two reasons. The first is because in several instances the majority has struck down provisions of the Abortion Control Act that I believe are constitutional. Second, I am especially concerned about the two instances, involving subsection (a) of section 3210 and section 3211, where the majority has addressed issues which I believe are not raised by the plaintiffs on appeal. It is my view that when deciding the constitutionality of a state statute it is particularly important that a federal court refrain from reaching out for issues not before it. In order to make my positions clear, I will address separately each section of the act addressed by the majority, using the same headings as in the majority opinion.

Section 3203: Definitions

*Abortion.* I join the majority in construing the definition of "abortion" as incorporating the intent requirement of 18 Pa. Cons. Stat.Ann. § 302(b), (c).

*Physician.* I join the majority in striking the definition of "physician" in the Abortion Control Act and applying the definition in the Statutory Construction Act, 1 Pa. Cons. Stat.Ann. § 1991.

Section 3205: Informed Consent

The Supreme Court's decisions in the *Akron* and *Ashcroft* cases make it clear that the 24-hour waiting period and the physician-only counseling requirements are unconstitutional. Pennsylvania conceded the unconstitutionality of these provisions. I therefore join the majority opinion to the extent that it strikes down these portions of section 3205.

The majority goes further, however, and strikes down subsection (a)(2) of section 3205 as well. I believe that this subsection is constitutional. A similar requirement at issue in *Akron* was struck down only because the information had to be provided by a physician. The information itself, however, was "not objectionable." *Akron,* 103 S.Ct. at 2501 n. 37. In Pennsylvania the information may be given by a non-physician counselor, so the objection the Supreme Court had to the Akron statute does not apply here. The majority's reliance on footnote 37 of the *Akron* opinion to support its refusal to sever and sustain subsection (a)(2) is misplaced. The same is true of the language from the *Akron* opinion quoted by the majority suggesting that subsection (a)(2) is an attempt to sway the woman against having an abortion or compels the physician to give information irrelevant to her personal circumstances. None of the language quoted in the majority opinion is addressed to those provisions of the Akron statute resembling subsection (a)(2).

In short, I believe that the *Akron* decision does not compel the conclusion that subsection (a)(2) is unconstitutional. I therefore dissent from that part of the majority opinion striking down this subsection.

Section 3206: Parental Consent

I concur in the majority's disposition of the attacks on this section.

Section 3207(b): Abortion Facilities, Reports

I join that part of the majority opinion rejecting plaintiffs' attack on section 3207.

Section 3208: Printed Information

The majority strikes down this section because it is "inextricably intertwined" with section 3205, which the majority strikes down in its entirety. The sole link between sections 3208 and 3205 is a cross reference in subsection (a)(2) of section 3205. It appears to me that section 3208 could stand on its own, and so I do not believe that a mere cross reference in section 3205 so taints section 3208 that it must fall at well. The majority does not discuss severance other than to say that there "is no certainty of any legislative intent that section 3208 should stand alone." This approach clashes with the severability clause included in the Act, which provides that "if any provision of this act ... is held invalid ... the remainder of this act or chapter ... shall not be affected thereby."

I also dissent from this part of the majority opinion because I believe that subsection (a)(2) of section 3205 is constitutional. Since the reference to section 3208 is in a part of section 3205 that I would sustain, in my view section 3208 is not "inextricably intertwined" with an unconstitutional provision.

Finally, I believe that section 3208, standing alone, is constitutional. The only provision which could be open to any dispute is subsection (b), which requires that the printed information describe "the probable anatomical and physiological characteristics of the unborn child at two-week gestational increments." Statutes of other jurisdictions requiring physicians to read descriptions of the unborn child to the mother prior to her consenting to an abortion have been struck down on the grounds that they interfere with the physician's exercise of his best medical judgment, that they require presentations in such lurid detail that they cause the woman mental anguish, that they represent impermissible attempts to sway the woman against abortion, or that they require the physician to state accu-

rately that which cannot be known with certainty. *See, e.g., Akron,* 103 S.Ct. at 2500–01; *Planned Parenthood League of Massachusetts v. Bellotti,* 641 F.2d 1006, 1021 (1st Cir.1981); *Charles v. Carey,* 627 F.2d 772, 784 (7th Cir.1980); *Leigh v. Olson,* 497 F.Supp. 1340, 1346 (D.N.D.1980); *Margaret S. v. Edwards,* 488 F.Supp. 181, 208–09 (E.D.La.1980).

The Pennsylvania statute avoids these problems because it simply provides the woman the right to view the printed materials if she so desires. There is no requirement that she view the materials or that the physician state the precise characteristics of the unborn child. There is no requirement that the materials go into detail likely to shock the mother. The statute specifically limits the printed materials to "scientifically accurate" information, which presumably would exclude such offensive detail as the unborn child's sensitivity to pain. *Akron,* 103 S.Ct. at 2500 n. 34. Finally, nothing in the statute prevents the physician from advising that the woman not view the materials, or disputing or supplementing them with his own information. I conclude that subsection (b) of section 3208 does not share the infirmities of the statutes struck down in the cases cited in the previous paragraph, and therefore I would sustain it.

Section 3209: Hospital-Only Requirement

The Supreme Court in *Akron* struck down as "a significant obstacle in the path of a woman seeking an abortion" a requirement that all abortions after the first trimester be performed in a hospital. 103 S.Ct. at 2495. Pennsylvania has conceded the unconstitutionality of section 3209, which imposes a similar requirement. I join the majority in striking down this section.

Section 3210: Abortion After Viability

*Prohibition.* I join that part of the majority opinion holding that the Supreme Court's decision in the *Simopoulos* case compels us to construe subsection (a) of section 3210 as placing the burden of proving lack of medical necessity on the prosecution.

I do not join that part of the majority opinion rejecting the challenge to the definition of "maternal health." My reading of the briefs does not disclose that plaintiffs have raised this issue on appeal.

Finally, I dissent from that part of the majority opinion discussing the chilling effect of the statute. The purpose of a criminal statute is to chill certain conduct. I believe that the only chilling which can concern us is that caused by some unconstitutional feature of the statute, such as vagueness or overbreadth. By incorporating an intent requirement into the definition of "abortion" found in section 3203, and by construing subsection (a) of section 3210 to place the burden of disproving medical necessity on the prosecution, we have addressed the specific sources of chilling identified by the plaintiffs.

The Supreme Court has made it clear that there is a permissible scope of state regulation of abortion. We can give no remedy when the physician, through his own overreacting, is chilled by regulations within this permissible scope. To the extent that the majority is suggesting that the mere existence of the Abortion Control Act, although constitutional, chills physicians, I believe that the problem is one which we may not remedy. To the extent that the majority is suggesting that other constitutional problems not addressed here may, if proved in later litigation, lead to a finding of impermissible chilling, I believe that we should await that future case. In either event I cannot join that part of the majority opinion addressing this issue.

*"Significantly greater" risk.* I join that part of the majority opinion holding subsection (b) of section 3210 unconstitutional.

*Second physician for viable fetus.* The majority strikes down subsection (c) on the ground that it contains no exception to the second-physician requirement in the case of a medical emergency. I dissent from this part of the majority opinion. I agree with the majority that the *Ashcroft* decision requires that in order to be constitutional, a second-physician requirement must include

an exception for emergencies. I believe, however, that such an exception is clearly expressed in subsection (a), which provides that "[it] shall be a complete defense to any charge brought against a physician for violating the requirements of this *section* ... that the abortion was necessary to preserve maternal life or health." (emphasis added). The plain meaning of the word "section" is to refer to section 3210 as a whole, including subsections (a), (b) and (c). This conclusion is bolstered by the legislature's use of the term "subsection" in subsections (b) and (c) when referring to matters limited to each of those subsections.

Had the legislature meant to limit the applicability of the medical emergency defense to subsection (a), it stands to reason that the legislature would have referred to "this subsection" rather than "this section." The majority ignores the use of the different terms and holds that to apply the medical emergency exception in subsection (a) to the second-physician requirement of subsection (c) would "rewrite the statute." However, since it is evident to me that the legislature was aware of the distinction between section and subsection, I believe that we should give effect to the plain wording of the medical emergency exception. I would hold that it applies to the second-physician requirement in subsection (c), and therefore I would sustain subsection (c).

Section 3211: Viability

I dissent from that part of the majority opinion striking down section 3211 because I do not believe that a challenge to this section is before us. Section 3211 is not mentioned by the plaintiffs in the complaint in the district court, and I cannot find a challenge to it in the briefs filed in this court.

Section 3214: Reporting

The majority strikes down subsections (a), (b), and (h) of section 3214. I dissent from this part of the majority opinion because I do not regard these reports as having a legally significant impact on the abortion decision. The majority first compares the requirements of section 3214 to those permitted by the Supreme Court in the *Danforth* case and finds Pennsylvania's requirements much more onerous. The Missouri statute sustained in *Danforth* provided for "the compilation of relevant maternal health and life data" without specifying what this means. 428 U.S. at 87, 96 S.Ct. at 2849. Based on this broad description in the Missouri statute I am unable to determine, as the majority apparently has, that the Missouri reporting requirements are more or less onerous than Pennsylvania's. In any event, in my view most of what Pennsylvania asks for in subsections (a) and (h) is "relevant maternal health and life data." I also believe that it meets the *Danforth* standard that the reports be "reasonably directed to the preservation of maternal health." 428 U.S. at 80, 96 S.Ct. at 2846.

The majority next suggests that the Pennsylvania requirement is so burdensome as to constitute an unconstitutional restriction on access to abortion. I disagree. In my view, to constitute an unconstitutional restriction a reporting statute would have to compel the physician to go out of his way to collect data that he would not otherwise need to make an informed medical judgment. However, subsections (a) and (h) require the physician to report information which I believe most physicians would obtain as a matter of course, or which is easily obtained through simple questions or observation. I am not persuaded that requiring the physician to report information of this sort imposes a legally significant burden.

The majority then states that the reporting requirements are unconstitutional because they will increase the costs of an abortion. The majority relies on paragraph 194 of the stipulation of facts, which states that the reporting requirements of section 3214 will cause the price of an abortion to increase by an unspecified amount. To me, this is an insufficient basis on which to conclude that a legally significant burden is imposed. The stipulation refers to section 3214 as a whole, not to the three subsections which are struck down. We have no

way of knowing what cost increase is attributable to these three subsections.[1]

It is significant that we do not know what cost increase would be caused by the subsections under attack, because not every cost increase caused by regulation imposes a legally significant burden on abortion. For example, five Justices concluded in the *Ashcroft* case that a required pathologists's examination that would add $19 to the cost of an abortion did not impose a legally significant burden. There is no evidence that we are dealing with a cost increase even approaching that magnitude. The majority has relieved the plaintiffs of their burden of proof by presuming that we are dealing with a cost increase significant enough to be unconstitutional. In my view doing this does not accord with the presumption of constitutionality favoring section 3214.

My belief, based on this record, that these subsections of section 3214 are not unconstitutional for the reasons stated by the majority compels me to reach the other ground advanced by the plaintiffs, that the reporting requirements violate the physician's and patient's privacy. I reject this contention. Subsections (e)(1) and (2) ensure that the identity of both the physician and the patient will not be available to the public. In addition, the pertinent statutory provisions prohibit including the name of the patient in the reports required by subsections (a) and (h). Finally, because I believe that the reporting requirement in subsection (a) is constitutional, I believe that subsection (b) requiring the transmittal of the reports should be sustained. I therefore dissent.

Section 3215(e): Insurance

I join the majority in holding that Morgan Plant has standing to challenge subsection (e) of section 3215 and in striking down that subsection.

## SUR PETITION FOR REHEARING

Before ALDISERT, Chief Judge, and SEITZ, ADAMS, GIBBONS, HUNTER, WEIS, GARTH, HIGGINBOTHAM, SLOVITER and BECKER, Circuit Judges.

The petition for rehearing filed by appellees-cross-appellants in the above-entitled case having been submitted to the judges who participated in the decision of this court and to all the other available circuit judges of the circuit in regular active service, and no judge who concurred in the decision having asked for rehearing, and a majority of the circuit judges of the circuit in regular active service not having voted for rehearing by the court in banc, the petition for rehearing is denied.

Chief Judge ALDISERT and Circuit Judge GIBBONS dissent from the denial of the petition for rehearing.

Statement by Circuit Judge ADAMS Sur Denial of Petition for Rehearing.

Eleven years ago, the Supreme Court, in *Roe v. Wade*, 410 U.S. 113, 93 S.Ct. 705, 35 L.Ed.2d 147 (1973), struck down a statute imposing severe criminal sanctions on physicians who performed abortions. That statute, in the eyes of the Court, impermissibly interfered with a woman's decision to terminate her pregnancy, thus abridging the fundamental right of privacy that guarantees freedom of choice in marriage and family life. Today, in the decision we are reviewing on a petition for rehearing, the majority declares a Pennsylvania statute constitutionally infirm because, among other reasons, it requires that physicians supply printed material that women seeking abortions need read only if they so desire.

I agree with the majority that certain portions of the statute cannot be reconciled with recent Supreme Court decisions, a judgment that the State concedes. However, to strike down the statute practically in its entirety is to forget how tightly constitutional adjudication is bound to the facts of those cases in which new constitutional principles are announced or devel-

---

**1.** In fact, it is not unreasonable to infer that much of the cost increase complained of in the stipulation would be caused by the pathologist's exam required by subsection (c) of section 3214. Plaintiffs have conceded that this requirement is constitutional.

oped. Such sweeping rejections of legislative enactments often result from a tendency to generalize the holdings of cases and to drive those generalizations to an extreme which, while perhaps exhibiting conceptual purity, belies the emptiness of logical constructs devoid of empirical content. All rights by their nature tend to declare themselves absolute, yet, in fact, they are all limited by competing rights as well as policy considerations.

The Supreme Court has identified two compelling state interests which, when pursued with scrupulous care, may justify regulations governing the exercise of the fundamental right to an abortion: the health of the pregnant woman seeking an abortion and the protection of fetuses capable of meaningful life. *City of Akron v. Akron Center for Reproductive Health*, 462 U.S. 416, 103 S.Ct. 2481, 2491–92, 76 L.Ed.2d 687 (1983). The Commonwealth of Pennsylvania has chosen to protect those interests by, for instance, specifying some of the information that must be made available before a woman's consent to an abortion is legally informed and by providing that a second physician, absent an emergency, shall attend the operation if a child might survive the abortion. Not all might agree with these measures, but a law is not void simply because it "may seem to the judges who pass upon it, excessive, unsuited to its ostensible end, or based on conceptions of morality with which they disagree." *Otis v. Parker*, 187 U.S. 606, 608, 23 S.Ct. 168, 169, 47 L.Ed. 323 (1903) (Holmes, J.). The Constitution does not embody a particular set of ethical principles, and judges are under a special duty in passing on the legitimacy of legislation not to constitutionalize that which legally speaking is in the end only a personal preference.

I vote for rehearing in this matter not only for the reasons set forth by Judge Weis, but also because, as I view it, the case involves questions of more than usual importance whose resolution requires that competing, legitimate interests be delicately balanced.

## STATEMENT OF JUDGE WEIS SUR PETITION FOR REHEARING

As an intermediate appellate court, we are bound to apply the Supreme Court's standards to the provisions of the Pennsylvania statute. However, I have serious reservations about the fashion in which the panel majority applied those standards to the many issues presented by this case. In the present procedural posture, however, I will discuss only a few of the questions that I believe warrant in banc consideration.

One major concern is the matter of "informed consent." I confess that I find some incongruity in the Supreme Court's exclusion of certain information that has a definite and direct bearing on whether the consent of the woman is truly knowledgeable. *See Akron v. Akron Center for Reproductive Health*, 462 U.S. 416, 103 S.Ct. 2481, 76 L.Ed.2d 687 (1983). Suppression of objective information highly pertinent to important decisions is indeed a disturbing and unwelcome concept in American law. In expanding that notion beyond the bounds set by the Supreme Court, the panel majority contravenes the teachings of *Akron* and other cases. *See, e.g., Planned Parenthood of Central Missouri v. Danforth*, 428 U.S. 52, 67, 96 S.Ct. 2831, 2840, 49 L.Ed.2d 788 (1976) ("The decision to abort, indeed, is an important, and often a stressful one, and it is desirable and imperative that it be made with full knowledge of its nature and consequences.")

Although *Akron* disapproved state requirements that were "designed not to inform the woman's consent but rather to persuade her to withhold it altogether," the Court did not prohibit all mandatory disclosures. Found "not objectionable" were some of the items that are listed in the Pennsylvania statute. *Compare Akron*, 462 U.S. at — n. 37, 103 S.Ct. at 2501 n. 37 *with* 18 PA.CONS.STAT.ANN. § 3205.

Moreover, the panel majority has ignored significant differences between the information specified in the Akron and Pennsylvania enactments. The Akron ordinance

was overturned because it exhibited specific objectionable characteristics, none of which are present in the Pennsylvania statute. Here, the legislature has limited the required disclosure of risks to instances "when medically accurate," 18 PA.CONS. STAT.ANN. § 3205(a)(1)(iii), thereby preserving the professional judgment of the physician. Nor can the Pennsylvania provision fairly be characterized as an attempt to misleadingly overstate the nature of abortion as a medical procedure.

In referring to the anatomical and physiological characteristics of the unborn child, the Pennsylvania Act provides only that materials on this subject be made available to the woman, who is free to choose whether she will view them. The Act states that the materials "shall be objective, nonjudgmental and designed to convey only accurate scientific information." 18 PA.CONS.STAT.ANN. § 3208(a)(2). Thus, the statute does not admit of the overreaching found objectionable in *Akron.*

To the extent Pennsylvania requires that information be given on the gestational age of the fetus, adoption, and the availability of assistance during pregnancy and after childbirth, the statute incorporates only matters that the Court in *Akron* found "not objectionable." Given these circumstances, I am at a loss to understand why the Pennsylvania informed consent provisions are held to be beyond permissible limits.

Applying the *Akron* yardstick to the Pennsylvania statute requires a review of the various provisions of the Pennsylvania statute independently, and on their own merit. That has not been done here; nor has there been persuasive analysis of why the severability provision of the Pennsylvania statute should not be honored.

The statute here also differs from the Akron ordinance in establishing civil as well as criminal consequences. In a severable clause, Pennsylvania provides that compliance with the required disclosures is a defense for the physician in a civil malpractice suit. *See* 18 PA.CONS.STAT. ANN. § 3205(d). A state's imposition of criminal sanctions that effectively deny the exercise of a constitutional right is quite a different jurisprudential consideration than setting standards for civil damage liability. No recognition of that distinction is apparent in the majority's approach. *Cf. Planned Parenthood of Missouri v. Danforth,* 428 U.S. 52, 88, 96 S.Ct. 2831, 2849, 49 L.Ed.2d 788 (1976) (Missouri statute provided that "[n]othing in this act shall be construed to exempt any person, firm, or corporation from civil liability for medical malpractice for negligent acts or certification under this act.").

A second major concern is the treatment of the parental consent provisions. *See* 18 PA.CONS.STAT.ANN. § 3206. Although this section is not rejected as facially unconstitutional, implementation is enjoined pending promulgation of rules by the state Supreme Court. I perceive no necessity to await such rules.

The Pennsylvania act is not less detailed in any constitutionally significant way than the parental consent provisions upheld by the Supreme Court in *Planned Parenthood Association of Kansas City, Missouri, Inc. v. Ashcroft,* 462 U.S. 476, 103 S.Ct. 2517, 76 L.Ed.2d 733 (1983). *Compare* 462 U.S. —— n. 4, 103 S.Ct. 2519 n. 4 *with* 18 PA.CONS.STAT.ANN. § 3206. The Pennsylvania statute provides the minor with a judicial alternative to parental consent and gives her the opportunity to demonstrate sufficient maturity to make the abortion decision. Absent that demonstration, the judicial officer is required to determine whether an abortion is in the woman's best interests. These are the essential requirements enunciated by the Supreme Court. *See Akron,* 462 U.S. at ——, 103 S.Ct. at 2497.

The rules, which are to be issued by Pennsylvania's highest court "as may be necessary," are to address the confidentiality and promptness of the judicial procedures. 18 PA.CONS.STAT.ANN. § 3206(h). The Act, however, already unambiguously provides that the "[c]ourt proceedings ... shall be confidential and shall be given ... precedence over other pending

matters." *Id.* § 3206(f). In highly specific language, the statute states that "in no case shall the court fail to rule within three business days of the date of application." *Id.* In addition, there is the requirement of a "sealed record" and the availability of an "expedited confidential appeal" for minors who are denied an abortion.

The statute as written satisfies the constitutional principles we are to apply to the issue of parental consent. That the Pennsylvania legislature has authorized "such rules as may be necessary" to supplement the statutory provisions does not permit this court to delay the effective date once federal constitutional requirements have been met. Although I have doubts that a construction to avoid constitutional infirmities is necessary here, one is easily accomplished by the reasonable assumption "that a state court presented with a state statute specifically governing abortion consent procedures for pregnant minors will attempt to construe the statute consistently with constitutional requirements." *Akron*, 462 U.S. at ——, 103 S.Ct. at 2498.

Along with Judge Seitz, I fail to understand why the majority strikes down reporting provisions in section 3214 of the Pennsylvania Act when any cost increase attributable to these requirements is not known. That the majority may also have ruled on questions not raised by the parties causes concern that it has gone beyond the proper bonds for testing the validity of a state statute.

Perhaps most significant, in my opinion, is the panel's general failure to give proper weight to the legislative decision, as expressed in the statute, to protect the life and health of the woman and the child subject to abortion. The state is not disinterested in the abortion decision but has an important and legitimate interest in protecting "the potentiality of human life." *Akron*, 462 U.S. at ——, 103 S.Ct. at 2491; *Roe v. Wade*, 410 U.S. 113, 162, 93 S.Ct. 705, 731, 35 L.Ed.2d 147 (1973). Although the woman is protected from "unduly burdensome interference with her freedom to decide" whether to abort, that right "im-

plies no limitation on the authority of a state to make a value judgment favoring childbirth over abortion, and to implement that judgment by the allocation of public funds." *Maher v. Roe*, 432 U.S. 464, 474, 97 S.Ct. 2376, 2382, 53 L.Ed.2d 484 (1977). "The Constitution does not compel a state to finetune its statutes so as to encourage or facilitate abortions." *H.L. v. Matheson*, 450 U.S. 398, 413, 101 S.Ct. 1164, 1173, 67 L.Ed.2d 388 (1981).

Some appreciation of the magnitude of the state's interest may be gleaned from the fact that in Pennsylvania alone there were 59,288 abortions in 1983. In the United States, 1,574,000 abortions were performed in 1982. By way of contrast, the number of deaths from automobile accidents in the United States in that same year, a state concern often referred to as "slaughter on the highways," was 43,945.

Our function as a federal court is to determine whether a state statute violates the federal constitution. If a statute may be construed to be constitutional, then we must adopt that interpretation. "Courts may not substitute for the judgments of legislators their own understanding of the public welfare, but must instead concern themselves with the validity under the Constitution of the methods which the legislature has selected." *In re Gault*, 387 U.S. 1, 71, 87 S.Ct. 1428, 1466, 18 L.Ed.2d 527 (1967) (Harlan, J. *concurring*).

The issues in this case, only a few of which I have discussed, are important and significant. Because they have farreaching effects and implicate the proper role of the states and the federal courts, the full court should review this case. Accordingly, I dissent from the order denying in banc consideration.